[No. 37485. Department One. June 24, 1965.]

WEST COAST AIRLINES, INC., *Respondent*, v. MINER'S AIRCRAFT & ENGINE SERVICE, INC., *Appellant*, ROBERT CLARK *et al.*, *Respondents.**

*Reported in 403 P.2d 833.

*Bayley, Fite, Westberg & Madden,* for appellant.

*Graham, Green, Dunn, Johnston & Rosenquist* and *Charles S. Mullen,* for respondent West Coast Airlines, Inc.

*Robbins, Oseran & Robbins* and *Gerald M. Hahn,* for respondents Lipset et al.

STAFFORD, J.†—West Coast Airlines, Inc., (hereinafter called West Coast) brought an action in replevin seeking the return of two aircraft engines from the appellant, Miner's Aircraft & Engine Service, Inc., (hereinafter called Miner's Aircraft) and from respondents Robert Clark and his wife (hereinafter called Clark).

Miner's Aircraft has appealed an adverse judgment. Twenty-seven assignments of error are made. The first 14 pertain to findings of fact based upon conflicting evidence. The findings of fact are amply sustained by the evidence. Thus, this court will not substitute its opinion for that of the trial court. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

---

†Judge Stafford is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

Sometime prior to September of 1959, West Coast purchased aircraft engines "A" and "B" for $2,280 and $2,285 respectively. They were delivered with all existing logbooks, engine build-up and repair records, change records and other documents required by the United States Federal Aviation Agency (hereinafter called the FAA). As owner of the engines, West Coast was entitled to the exclusive possession of both engines and their associated records.

Prior to September 4, 1959, West Coast sealed each engine in a large metal storage container, or "engine can". At that time, engine "A" was ready for future use. Engine "B" had experienced a mechanical failure and was stored for repair or other disposition. At this time, West Coast kept approximately 23 spare engines in the same hangar. However, none was stored in an "engine can".

In the course of its operation, West Coast accumulated unuseable scrap metal that was sold to junk dealers. At the time here in question, West Coast had collected an excessive number of sealed "cans" which had been placed along a fence near the hangar to get them out of the way.

Junk Traders is a commercial scrap metal company engaged exclusively in the purchase, sale and trade of scrap metal. In June, 1960, West Coast's purchasing agent asked Junk Traders to pick up the "cans" along the fence. The "cans" were constructed of ⅜-inch steel and were very heavy. It was necessary for Junk Traders to use a forklift truck to load them. When the job was completed, Junk Traders had salvaged four truckloads of sealed "cans" and one truckload of "can" halves and other miscellaneous scrap. Junk Traders paid West Coast 2 cents a pound for 20,370 pounds of scrap metal.

Through some inadvertance, and wholly unknown to either West Coast or Junk Traders, the two sealed "cans" containing engines "A" and "B" were loaded by Junk Traders' driver and delivered to their junkyard. However, West coast continued in possession of all documents required by the FAA because the removal of the two engines had been in error.

The "cans" containing the two engines remained unopened at the junkyard for many months. In July, 1961, a competing junk dealer told Mr. Miner (president of Miner's Aircraft) that the two "cans" contained engines that might be of interest to him. However, Mr. Miner did not act on the tip for some time.

In the meantime, Junk Traders began to cut the "cans" into scrap. It was then that the engines were discovered for the first time. Junk Traders set them aside in their "cans".

Mr. Miner was thoroughly experienced in aircraft engines, their value, trade practices, and terminology relating to such equipment. He was also fully familiar with the FAA regulations which required that all of the above-mentioned records be transferred to a new vendee upon sale of an engine.

Shortly prior to September 27, 1961, Mr. Miner visited the junkyard and found the two engines still in the "cans". He made, what appeared to be, a rather casual inspection of the engines. He did not want to arouse Junk Traders' curiosity as to their true value. However, his examination was sufficient to convince him that both engines had considerable value.

Both from his own examination and from conversations with Junk Traders' employees, Mr. Miner knew that the engines had belonged to West Coast. He knew that the engines had a value of approximately $3,500 each and that they were not mere scrap metal. He knew that Junk Traders was wholly unaware of the character and value of the engines. He also had reason to know that the junk dealers did not possess the documents required by the FAA.

Miner advised Junk Traders that West Coast was the only air carrier in the state that used such engines. He told them that, since West Coast had disposed of the engines, they were of no use to anyone else. He convinced Junk Traders that both engines were worth only scrap metal prices.

On or about the 27th of September, 1961, Mr. Miner "purchased" the two engines for Miner's Aircraft. He paid $125, based upon their combined weight as scrap metal. He did not ask for the required logs and maintenance papers.

Shortly thereafter, Miner's Aircraft purported to sell engine "B" to Clark without the necessary accompanying documents. In exchange, Clark delivered in trade, seven cylinder lapping machines valued at $1,455. However, due to subsequent events, Miner's Aircraft never delivered engine "B" to Clark.

Before Junk Traders was paid for the two engines, Miner called West Coast and attempted to obtain the necessary records for engine "A". During a telephone conversation on October 10, 1961, he advised a West Coast employee that "those records would be worth a jug of booze to me". This was the first time West Coast realized that either engine was missing. After expressing some alarm to Miner, West Coast immediately called Junk Traders in an effort to correct the mistake.

There is a question whether Mr. Miner mailed his $125 check for the two engines before or after he discovered West Coast's mistake. Mr. Miner contends that he mailed it just before the call was placed. However, before Junk Traders received the check, they visited Mr. Miner at his place of business and advised him of the mistake. Mr. Miner refused to return the engines. Thereafter, Junk Traders returned the Miner's Aircraft check as soon as they received it.

The trial court entered judgment for West Coast for the return of the two engines from Miner's Aircraft. Miner's Aircraft was given a judgment against Junk Traders for $100 and, in turn, Junk Traders was given a judgment of $175 against West Coast. Clark received a judgment against Miner's Aircraft for the return of his seven cylinder lapping machines plus $100 for amounts expended by him.

■ Conclusion of law No. 4 provides that Clark is entitled to recover $100 out-of-pocket expenses. Miner's Aircraft contends that there is no evidence to support such an

award. However, finding of fact No. 7 declares that Clark incurred such expenses. No error was assigned to this finding and thus it becomes an established fact in the case. Rule on Appeal 43, RCW vol. 0. An assignment of error as to a conclusion of law does not bring up for review the facts found upon which the conclusion is based. *LeCocq Motors v. Whatcom Cy.*, 4 Wn.2d 601, 104 P.2d 475 (1940). An assignment of error is without merit where it is based upon conclusions supported by findings which are not challenged and which have become established facts in the case. *Wygal v. Kilwein*, 41 Wn.2d 281, 248 P.2d 893 (1952).

Miner's Aircraft also assigns error to the conclusion of law holding that Clark is entitled to the return of his seven cylinder lapping machines. However, Miner's Aircraft neither delivered engine "B" to Clark nor gave him title to it. Thus, there was a complete failure of consideration. Clark is entitled to the return of the seven machines that were traded for engine "B". 3 Williston, Sales § 600 (rev. ed.).

Miner's Aircraft asserts that equity will not relieve West Coast of its contract with Junk Traders because there was no mutual mistake of fact to support a rescission. However, the law of "mutual mistake" is not applicable. The parties never made a contract for the sale of the engines. Thus, there was no contractual mistake, mutual or otherwise. In the absence of a contract of sale, there is no need for a rescission to regain title that was never lost.

The "cans" must be distinguished from their contents. West Coast intended to sell "cans" and Junk Traders intended to buy them. Their title passed to Junk Traders. However, neither party was aware of the contents. Neither the vendor nor the vendee intended that title to the engines would pass with the "cans".

A sale is a consensual transaction. The subject matter which passes is to be determined by the intent of the parties, as revealed by the terms of their agreement, in the light of the surrounding circumstances. 46 Am. Jur. *Sales* §§ 129, 142; 77 C.J.S. *Sales* § 24, pp. 630, 631; RCW 63.04.040.

The engines were not part of an agreement between West Coast and Junk Traders. Unknown contents of the subject matter of a sale that are not essential to its existence or usefulness, but which are merely deposited therein, and which are not within the contemplation of or intention of the contracting parties, do not pass by the sale. *Huthmacher v. Harris's Adm'rs*, 38 Pa. 491, 80 Am. Dec. 502 (1861); *Livermore v. White*, 74 Me. 452, 43 Am. Rep. 600 (1883); *Evans v. Barnett*, 6 Del. (6 Penne.) 44, 63 Atl. 770 (1906); 46 Am. Jur. *Sales*, Unknown Contents of Articles Sold, § 147; 3 Williston, Sales, Mistake Rendering Agreement Void, § 654, (rev. ed. Supp. 1965). A contract of sale, like any other contract, must rest upon the mutual agreement of the parties on all essential elements of the sale. 77 C.J.S., *Sales*, Mutual Assent or Agreement, § 24, including the identity of the thing sold. *American Nat. Bank of Nashville v. West*, 31 Tenn. App. 85, 212 S.W.2d 683, 4 A.L.R.2d 314 (1948).

There was no meeting of the minds, no contract and thus no sale of the engines. Title to the two engines remained in West Coast. *Huthmacher v. Harris's Adm'rs, supra; Livermore v. White, supra; Evans v. Barnett, supra.*

In essence, the trial court found that Mr. Miner had actual and reasonable notice of West Coast's claim of ownership prior to his abortive attempt to purchase the engines. It found that Miner's Aircraft was not damaged by any act, conduct or representation of either West Coast or Junk Traders. In fact, it found that Miner's Aircraft relied solely upon the expertise of Mr. Miner in the field of aircraft engines, their value, trade practices and FAA regulations. The court also found that, based upon the nature of Mr. Miner's personal knowledge of the circumstances surrounding the "purchase", he had a duty to make further inquiry and that, in failing to do so, he did not act reasonably. It was also determined that, under the circumstances, Miner's Aircraft had not actually changed its position as to either engine. Finally, and of considerable importance, the trial court found that Mr. Miner had failed to act in good faith

both in the negotiations and in the actual purchase of the two engines from Junk Traders.

Title to the engines did not pass from West Coast to Junk Traders. Thus, no title passed from Junk Traders to Miner's Aircraft. RCW 63.04.240.

■ Based upon the foregoing circumstances, West Coast is not precluded from denying Junk Traders authority to sell the engines. RCW 63.04.240. Estoppel is involved when the court is called upon to decide which of two innocent parties must bear a loss. *Kozak v. Fairway Finance—Seattle, Inc.*, 60 Wn.2d 500, 374 P.2d 1011 (1962). Miner's Aircraft failed to show either the blamelessness or the reasonable conduct necessary to assert estoppel.

Miner's Aircraft contends that Junk Traders breached an implied warranty of the "right to sell" and an implied warranty that the purchaser would enjoy "quiet possession" of the engines. RCW 63.04.140(1), (2). However, the suggested proof on this point would require this court to reject findings that are supported by substantial evidence. This, the court will not do. *Thorndike v. Hesperian Orchards, Inc., supra.*

■ The above-mentioned implied warranties may be rebutted. They are rebutted when, as in this case, the facts indicate that prior to the sale the buyer had knowledge superior to the seller as to the subject matter and the facts and circumstances; that the buyer had actual and reasonable notice of the very defects now complained of; that from such facts the buyer knew the seller's right to sell and his chance of peaceful possession were doubtful; that the buyer had relied solely upon his own expert ability and relied in no way upon the seller; that the buyer had not been damaged by reason of any act, conduct or representation of the seller; and that the buyer failed to act in good faith in the negotiations and the final purchase of the engines. 1 Williston, Sales, Limitations on Implied Warranty of Title, § 219 (rev. ed.), and Supp. 1965; 8 Williston, Contracts, Limitations on Implied Warranty of Title, § 978

(3d ed.); 46 Am. Jur. *Sales*, Exceptions to General Rule, § 404; 77 C.J.S. *Sales*, Defects in Title, § 315d.

The trial court's conclusion of law that Miner's Aircraft had failed to sustain the burden of proof in its complaint against Junk Traders is supported by the findings of fact.

The other errors assigned by Miner are moot.

Judgment affirmed.

ROSELLINI, C. J., HILL, HUNTER, and HALE, JJ., concur.