[No. 7327–3–I.    Division One.    July 14, 1980.]

THE CITY OF EVERETT, *Plaintiff,* v. ESTATE OF ODDMUND SUMSTAD, *Respondent,* AL MITCHELL, ET AL, *Appellants.*

*Robert S. Bryan* and *Lanning & Bryan,* for appellants.

*Wilfred E. Schlicker* and *Franklin & Watkins,* for respondent.

DORE, J.—The Mitchells appeal from a summary judgment establishing that the estate of Oddmund Sumstad has the superior legal and equitable right in title to the sum of $32,207, found in a locked compartment of an auctioned safe.

## ISSUES

ISSUE 1: Under the objective theory of contracts, did the parties at an auction reasonably manifest an intent to include the contents of a safe in its sale?

ISSUE 2: Are the Mitchells, the successful bidders at an auction, entitled to reasonable attorney's fees because they were required to defend the interpleader action?

## FACTS

The facts are undisputed. The Mitchells, who operate a secondhand store, attended an auction and purchased a safe for $50. They subsequently delivered it to a locksmith who, upon opening a locked inner door, found $32,207. The locksmith contacted the Everett Police Department, which impounded the funds. Both the Mitchells and the estate

made a claim to the funds, and thereafter the City of Everett commenced an interpleader action.

The Mitchells were regular customers at the auction and were familiar with a sign that appeared behind the auction block which read: "All Sales Are Final." In their affidavit, they stated that:

> At the auction we saw, among other things, . . . two safes . . . Regarding the one we ultimately purchased, we saw that the top outer–most door with a combination lock was open, and that the inner door was locked shut. That inner door required a key to open, and we learned that the safe would have to be taken to a locksmith to get the inner door opened because no key was available. We also learned that the combination for the outer lock was unknown. The auctioneer told the bidders that both this and the other safe had come from an estate, that both were still locked, that neither had been opened, and that the required combinations and key were unavailable for either. They were both like a "pig–in–a–poke" because of the equal possibilities that: (1) The inner contents or condition would be detrimental to its value to us; (2) would increase its value to us; (3) it would be empty or its contents without significance. In any event, we did know that its ultimate value to us depended in part upon whether a locksmith could make it operable or could only damage it in opening the inner drawer. The cost of the locksmith's effort was also a factor. The purchase of this safe was a gamble on our part in these respects.

The auctioneer stated in his affidavit that he was contacted by the executor of the estate and agreed to auction off certain property for a 30 percent commission. He initially went to the decedent's residence and was shown certain property by three young girls. He observed three safes; however, because he was told that the family wanted to keep one of the safes, he had to return with the executor, who showed him which items were to be removed, including two of the safes. At the auction he told the crowd that the safes were from an estate; that an inner door was locked and had never been opened; and that he did not have the combination.

The personal representative of the estate stated in an affidavit that he had hired the auctioneer as an agent to sell certain personal property belonging to the estate, but that he ".only intended to sell the safe, not the contents." He further stated that he believed the safe, a "tube" type safe with access gained from the top, was empty.

Based upon these undisputed facts, the trial court determined that the contents of the safe—$32,207—belonged to the estate.

## DECISION

ISSUE 1:

The Mitchells contend that they are entitled to the contents of the safe under RCW 62A.2–403(2) because the estate, through its agent, entrusted the safe and its contents to the auctioneer, a merchant, who sold it to them as buyers in the ordinary course of business. We disagree.

The adoption of the Uniform Commercial Code did not alter common–law principles requiring a "meeting of the minds" to validate a contract. *Lakeside Pump & Equip., Inc. v. Austin Contr. Co.,* 89 Wn.2d 839, 576 P.2d 392 (1978). Although the auctioneer may have been a special agent for the estate, Restatement (Second) of Agency § 1, comment *e* (1958), and had the authority to enter into a contract for his principal for the sale of the safe and its contents, the ultimate question is whether there was in fact a sale of the safe and its contents at the time of the auction. Resolution of this issue depends upon an analysis of the objective theory of contracts.

In *Swanson v. Holmquist,* 13 Wn. App. 939, 942, 539 P.2d 104 (1975), the court stated:

> Mutual assent is the modern expression for the concept of "meeting of the minds." *See Wetherbee v. Gary,* 62 Wn.2d 123, 381 P.2d 237 (1963). In the absence of mutual assent there can be no contract. . . . Mutual assent cannot be based upon subjective intent, but rather must be founded upon "an objective manifestation of mutual intent on the essential terms of the promise."

(Citations omitted.) *See Barnes v. Treece,* 15 Wn. App. 437, 549 P.2d 1152 (1976); *Wesco Realty, Inc. v. Drewry,* 9 Wn. App. 734, 515 P.2d 513 (1973).

> The objective theory lays stress on the outward manifestation of assent made to the other party in contrast to the older idea that a contract was a true "meeting of the minds."

J. Calamari & J. Perillo, *Contracts* § 2–2, at 24 (2d ed. 1977). "A party's intention will be held to be what a reasonable [person] in the position of the other party would conclude his [or her] manifestations to mean." J. Calamari & J. Perillo, *supra* at 24.

■ The issue as to whether the sale of an item also includes the sale of its contents is discussed in Annot., 4 A.L.R.2d 318, 319 (1949):

> Since a sale is a consensual transaction, the subject matter which passes is to be determined by the intent of the parties, as revealed by the terms of their agreement in the light of the surrounding circumstances.
>
> Thus, in determining whether an article secreted in the ostensible subject matter also passes by the sale the courts have looked to the terms of the contract and the situation of the parties. Where both buyer and seller were ignorant of the existence or presence of the concealed valuable, and the contract was not broad enough to indicate an intent to convey all the contents, known or unknown, the courts have generally held that as between the owner and the purchaser, title to the hidden article did not pass by the sale.

(Footnote omitted.) In *West Coast Airlines, Inc. v. Miner's Aircraft & Engine Serv., Inc.,* 66 Wn.2d 513, 403 P.2d 833 (1965), the court was asked to resolve a conflict in the ownership of two aircraft engines that had been stored in engine cans and sold to a junk dealer as scrap metal. In an action for replevin of the engines, the court stated at page 518 that:

> A sale is a consensual transaction. The subject matter which passes is to be determined by the intent of the parties, as revealed by the terms of their agreement, in the light of the surrounding circumstances.

The court relied upon the cases cited in Annot., 4 A.L.R.2d 318 (1949), and stated:

> Unknown contents of the subject matter of a sale that are not essential to its existence or usefulness, but which are merely deposited therein, and which *are not within the contemplation of or intention of the contracting parties, do not pass by the sale.*

(Italics ours.) *West Coast Airlines, Inc. v. Miner's Aircraft & Engine Serv., Inc., supra* at 519. Although the court applied the "meeting of the minds" test, it is apparent that under the objective theory of contracts, there was no mutual assent as to the sale of the engines inside the sealed engine cans. In our view, *West Coast Airlines* is controlling authority.

The question becomes: Did the parties here reasonably and objectively manifest an intent to include the contents of the safe in its sale?

The undisputed evidence shows that the Mitchells were regular patrons of the auction. Prior to bidding, the auctioneer described the safe as coming from an estate and containing an inner door that was locked and required a key to open. Neither the auctioneer nor the purchasers expressly stated that any unknown contents were included in the sale of the safe. Although it may be argued that the auctioneer's statements concerning the condition of the safe implied that both the safe and its contents were for sale, a more reasonable conclusion is that he simply informed possible bidders as to the safe's true value, *i.e.,* that it was not fully operable and would have to be taken to a locksmith. It does not reasonably appear that the auctioneer, as agent, objectively manifested an intent to sell the contents of the safe.

Similarly, the Mitchells could not reasonably have expected to purchase the contents of the safe simply because they were told that a particular door or compartment was locked or because subjectively they hoped to find something of value in the item purchased. A bidder who is an experienced purchaser at auctions, knowing that the safe

was part of an estate sale, would have reasonably expected that it had been inventoried and any contents removed. The ultimate purchase price of $50 appears reasonable in light of the safe's condition, and there is no evidence that the auctioneer attempted to inflate the bidding by emphasizing the fact that the safe was partially locked. Nor was the money deposited in the locked door of the safe essential to its usefulness. The Mitchells' statement that they believed their buying the safe was like a "pig–in–a–poke" is not dispositive of whether under the objective theory of contracts they also purchased the safe's unknown contents. The subjective and unexpressed intent of the parties is immaterial. *Barnes v. Treece, supra.*

We, therefore, are compelled to conclude from the undisputed facts and circumstances that the parties did not objectively enter into a contract for the sale of the safe and its *contents,* but only a sale of the safe. Consequently, the title to the $32,207 cash shall remain in the estate.

Issue 2:

The Mitchells also contend that they are entitled to reasonable attorney's fees.

In *Manning v. Loidhamer,* 13 Wn. App. 766, 769, 538 P.2d 136 (1975), the court stated:

> It is the general rule in this state that attorney's fees are not ordinarily recoverable except pursuant to statute, contractual obligation, or some well–recognized principle of equity. . . .
> It is equally well settled that when the natural and proximate consequences of a wrongful act of defendant involve plaintiff in litigation with others, there may as a general rule be a recovery of damages for reasonable expenses incurred in the litigation, including attorney's fees. The original suit generating the expenses must be instituted by a third party not connected with the original transaction. . . .
> Three elements are necessary to create liability: (1) a wrongful act or omission by A toward B; (2) such act or omission exposes or involves B in litigation with C; and

(3) C was not connected with the initial transaction or event, *viz.,* the wrongful act or omission of A toward B.

(Citations omitted.)

The Mitchells are not entitled to attorney's fees pursuant to statute, contractual obligation or any well recognized principle of equity. The common–law theory of indemnity stated in *Manning v. Loidhamer, supra,* is not applicable because the Mitchells have not demonstrated a wrongful act or omission by the estate (A) which exposed them (B) to litigation with the City of Everett (C). Similarly, their claim for attorney's fees on appeal pursuant to RAP 18.1 is denied.

Affirmed.

RINGOLD, J., concurs.

DURHAM–DIVELBISS, J. (dissenting)—I agree with the majority's formulation of the issue, *i.e.,* whether there was a contract for the sale of the contents of the safe, but I must respectfully dissent from its analysis.

Washington courts have long adhered to the objective manifestation theory in analyzing contract formation. *Plumbing Shop, Inc. v. Pitts,* 67 Wn.2d 514, 408 P.2d 382 (1965); *Alexander & Alexander, Inc. v. Wohlman,* 19 Wn. App. 670, 578 P.2d 530 (1978). Under this theory, it is the objective manifestations of the parties that are significant, not their secret, unexpressed intentions.[1] *Plumbing Shop, Inc. v. Pitts, supra; Bond v. Wiegardt,* 36 Wn.2d 41, 216 P.2d 196 (1950); *Washington Shoe Mfg. Co. v. Duke,* 126 Wash. 510, 218 P. 232 (1923); *Barnes v. Treece,* 15 Wn. App. 437, 549 P.2d 1152 (1976).

The objective manifestations of the parties are subject to the reasonable person test, *Alexander & Alexander, Inc. v.*

---

[1] In the present case, the estate's subjective intent would be important only if we needed to decide whether the auctioneer's action in selling the contents of the safe was unauthorized. In light of the majority's holding, however, the issue of whether an agent's unauthorized sale would bind his principal under these circumstances need not be discussed here.

*Wohlman, supra,* and thus an offeree's right to rely upon an offeror's objective manifestations must be interpreted in light of what "a reasonable person in the position of the parties would have thought it meant." *Wharf Restaurant, Inc. v. Port of Seattle,* 24 Wn. App. 601, 608, 605 P.2d 334 (1979), quoting from 1 S. Williston, *Contracts* § 94 (3d ed. 1957). If a party's words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established. *Wesco Realty, Inc. v. Drewry,* 9 Wn. App. 734, 515 P.2d 513 (1973); *Gaasland Co. v. Hyak Lumber & Millwork, Inc.,* 42 Wn.2d 705, 257 P.2d 784 (1953); *Washington Shoe Mfg. Co. v. Duke, supra.*

The facts in the present case compel the conclusion that a reasonable person in the position of the purchasers would have thought the auctioneer manifested an objective intent to sell the safe and any contents. According to the purchasers' affidavit, "[t]he auctioneer told the bidders that both this and the other safe had come from an estate, that both were still locked, that neither had been opened, and that the required combinations and key were unavailable for either." The auctioneer's affidavit similarly stated that, "I told the crowd at the auction that they [the two safes] were from an estate, that they were still locked and had never been opened by me and that I didn't have the combinations." The auctioneer's statements to the bidders are critical, undisputed facts that cannot be ignored. Similarly, we cannot ignore the fact that even though the locked compartment was apparent to the auctioneer as well as to the bidders, the auctioneer made no statement reserving rights to the contents, if any, to the estate.

I would hold that the parties mutually assented to a contract for the sale of the safe and its contents because: (a) The contents were of a general type that could be reasonably anticipated to be contained therein; (b) both the buyers and the auctioneer, who as the seller's agent had the apparent authority to sell, had actual knowledge of the

locked compartment; and (c) no reservation of rights to the contents, either express or implied, was made.

The majority's exclusive reliance upon *West Coast Airlines, Inc. v. Miner's Aircraft & Engine Serv., Inc.,* 66 Wn.2d 513, 403 P.2d 833 (1965), as the "controlling authority" for resolving the issue before us is inapt. It is difficult to imagine two factual situations more dissimilar than *West Coast Airlines* and the one before us.

Sometime prior to September 1959, West Coast purchased two aircraft engines for $4,565 along with the documents required by the Federal Aviation Agency (FAA). The two engines were sealed in large metal storage containers. Approximately 1 year later, West Coast contacted a commercial scrap metal company, Junk Traders, to purchase and remove several sealed "cans" of scrap metal. Inadvertently, and wholly unknown to either West Coast or Junk Traders, the two airplane engine cans were removed by Junk Traders along with the other scrap, for which Junk Traders paid West Coast 2 cents a pound. West Coast continued in possession of its FAA documents, unaware that the engines had been removed. The next year, Mr. Miner, the president of Miner's Aircraft, learned from a competitor of Junk Traders that the two cans contained airplane engines and he undertook some rather questionable endeavors to secure possession. In late 1961, Mr. Miner purchased both engines from Junk Traders for $125 and shortly thereafter resold one of them, without the FAA documents, to a fourth party for considerably more. West Coast first became aware of the mistake about this time as the result of a telephone conversation in which Mr. Miner told a West Coast employee that the FAA records to the other engine would be "worth a jug of booze to me." *West Coast Airlines,* at 517. Shortly thereafter West Coast commenced suit to recover the two engines.

It is thus readily apparent that in *West Coast Airlines,* neither party was aware that there was even a chance that the sealed cans contained anything other than scrap metal. Most significantly, the two airplane engine containers

themselves were not bargained for because their inclusion with the other sealed cans was inadvertent and wholly unknown to both parties. It is also abundantly clear that West Coast did not intend to pass title to the airplane engines because West Coast retained the FAA documents that must be transferred to the purchaser upon the sale of an engine.

Here, however, the subject matter of the sale was clearly a safe containing a locked compartment. Both the purchasers and the auctioneer, acting as the estate's agent, knew that the safe contained a locked compartment, and the purchasers heard the auctioneer declare that the safe had not been opened and that he did not have the key. These facts, coupled with the purchasers' knowledge of the auction's own rule that all sales were final, indicate that the parties, judged by a reasonable standard, mutually assented to the sale of a chance. These facts render *West Coast Airlines* virtually valueless in analyzing the issue before us.

Unlikely as it may seem, there is only limited precedent upon which to rely. The precise issue before us has been reported approximately a dozen times in over 200 years. *See* Annot., *Title to unknown valuables secreted in articles sold,* 4 A.L.R.2d 318 (1949). Nevertheless, several of the reported cases are far more similar factually to the case at bar than is *West Coast Airlines.*

In the first of these cases, *Merry v. Green,* 151 Eng. Rep. 916 (1841), a shoemaker purchased an old secretary–type bureau at a public auction. Because one drawer of the bureau could not be opened, the auctioneer made a reference to it, although the testimony at trial was conflicting as to whether or not he stated he was selling the bureau's contents. The purchaser later discovered a secret drawer, different from the one mentioned at auction, and found it to contain a purse with coins and bank notes. In the purchaser's action in trespass for assault and false imprisonment (arising out of being dragged away to the magistrate on a larceny charge), the trial court held that the purchaser

had committed no felonious taking of the bureau's contents, and the jury was allowed to decide only the issue of damages. The court stated it would be larceny only if the purchaser had

> express notice that he was not to have any title to the contents of the secretary if there happened to be any thing in it, and indeed without such express notice if he had no ground to believe that he had bought the contents . . .

*Merry,* at 920. The purchasers in the case before us had good ground to believe they had bought the safe as well as its contents, and they had no express notice that they were not purchasing the contents.

The Scottish case of *Dawson v. Muir,* 29 Sess. Cas. 843 (1851) involved an auction held on premises that had been used for some years to manufacture white lead (paint). Among the items auctioned off were some vats, partially sunk into the ground, which appeared to contain waste water, sand, and rubbish, and they were sold as they stood. Later, when the purchaser hired a chemical analyst to ascertain the water's contents, the vats were found to contain valuable white lead worth 150 times the purchase price. The issue at trial was whether the sale of the vats was also a sale of their contents, and all three judges, for different reasons, upheld the lower court judge's ruling that the purchaser had bought the white lead in the vats.

Lord Fullerton wrote that it was "difficult to dispute" that there was a good sale of the vats and all that was in them. *Dawson,* at 852. He asked: "But was not white lead just one of the articles which the parties might most naturally have in view when dealing for the goods of a colour merchant?" *Dawson,* at 852. Lord Cuninghame wrote that this case was distinguishable from those dealing with a garment with a jewel in it, or a bureau with money in it, because the waste water or refuse was "openly and visibly comprehended among the articles sold . . ." *Dawson,* at 852.

Finally, the Lord President noted that the court's holding in *Dawson* was narrow because of the facts. In ruling that the trustee for the bankrupt white lead manufacturer was not entitled to the white lead (this was an issue because the trustee had sold the vats to the seller before the seller auctioned them off to the purchaser), he noted that

> [t]hese contents were undoubtedly within the trade of a colour manufacturer, and if blame attaches to any one in the transaction, it is to the trustee. . . . if the trustee did not examine what he was selling, he must bear the loss.

*Dawson,* at 853. Similarly, if there is any fault in the instant case, it must be laid to the estate for failure to examine the contents of a locked compartment of a safe before consigning it to auction.

In ruling that the purchaser was entitled to the valuable white lead, the Lord President continued:

> On the evidence it is as clear as the sun at noonday that the purpose of the sale was to clear the premises—that these vats were declared to be part of the subjects sold—and that the question, whether their contents were to go with them, was put, and answered in the affirmative. Suppose only a small quantity of white lead had been found, would the sellers insist on its being given over to them, although their own auctioneer had said that the vats included every thing in them? Or suppose the vats, although supposed to be entirely made of wood, had been found to be lined with lead or any other metal, would the seller be allowed to strip off that metal? That would be a most extravagant proposition.

*Dawson,* at 853-54. I suggest that it was just as reasonable for the purchasers in this case to find money or valuables in a locked safe as it was for the purchaser in *Dawson* to find white lead in a vat formerly used for making that material.

Finally, in *Crespin v. Puncheon,* 7 Vict. L.R. 203 (1881), the plaintiff purchased salvage goods from defendant at an auction. The catalogue described the goods as four bales of "news paper" (newsprint). Later, it was discovered that the bales contained calico instead of newsprint, making them

much more valuable. The defendant refused to deliver the bales to the plaintiff and sold them to a third party at a higher price. In plaintiff's action for damages for nondelivery of the bales, the court held that the parties' contract was to buy and sell whatever the bales contained and it affirmed the judgment in favor of plaintiff.

Chief Judge Stawell said that the case turned solely upon what was the contract. The judge ruled that "[t]aking the whole together, a chance was sold, and what was bought was a chance also." *Crespin,* at 209. In my view, this is exactly what happened in the case before us. To hold otherwise is to ignore the realities of the marketplace and to leave the reasonable expectations of the buyer grossly unprotected.

Regrettably, only two cases can be found concerning safes, and neither furnishes much guidance here. Most nearly on point is *Ray v. Light,* 34 Ark. 421 (1879). There, the plaintiff left his safe containing scrip, bonds, and jewelry, in his drugstore when he departed the city. About 1 month before the plaintiff returned, the defendant purchased at a judgment execution sale the plaintiff's stock of drugs, his safe, and certain other merchandise. The defendant testified he thought he was buying the safe and its contents. Plaintiff brought an action for conversion of the safe's contents, and the trial court's judgment in favor of plaintiff was affirmed. Unfortunately, the *Ray* opinion does not relate any of the circumstances of the sale of the safe to the defendant. The reader does not know if the safe was locked, or what the sheriff said when offering the safe for sale. The defendant apparently simply conceded he had not acquired title to the contents of the safe, for the court said:

> That appellee [plaintiff] had title to the scrip, bonds and jewelry in controversy on this appeal, does not, upon the evidence adduced at the trial, admit of doubt. Counsel for appellant concedes that by his purchase of the safe at the execution sale, he acquired no title to the contents of the safe. There is no evidence that the sheriff

opened the safe levied upon, and sold its contents, if he might have done so. *Allen on Sheriffs, p. 110.*

*Ray,* at 427.

The other case concerning a safe is not strictly on point, as its rationale was based upon a finder's theory rather than upon a no–contract theory, and the true owner of the money found hidden inside was unknown. *See Durfee v. Jones,* 11 R.I. 588, 23 Am. Rep. 528 (1877). In ruling that the defendant finder was entitled to keep the money, the court also said:

> The safe was left with the defendant for sale. As seller he would properly examine it under an implied permission to do so, to qualify him the better to act as seller. . . . And the defendant, having found in the safe something which did not belong there, might, we think, properly remove it. He certainly would not be expected either to sell the safe to another, or to buy it himself without first removing it.

*Durfee,* at 591.

Some of the other cases cited in 4 A.L.R.2d 318, which collects the only relevant cases to be found, are distinguishable because the objective manifestations of the parties did not reflect any intent to convey title to the unknown contents of the articles sold.[2] The remaining cases cited in the same annotation are decided upon a finder's theory, which is inappropriate to apply here.[3] A true

---

[2]*See Huthmacher v. Harris's Adm'rs,* 38 Pa. 491 (1861) (purchaser of "drill machine" held not entitled to money and other valuables later found secreted inside); *Evans v. Barnett,* 22 Del. (6 Penne.) 44, 63 A. 770 (1906) (purchaser of table at estate sale held not entitled to money later found inside a pocketbook that was in table drawer); *Hoeppner v. Slagle,* 141 Ind. App. 622, 231 N.E.2d 51 (1967) (purchaser of house at tax sale held not entitled to stock certificates and bonds later found in dresser drawers, books, magazines, and newspapers inside the house); *American Nat'l Bank v. West,* 31 Tenn. App. 85, 212 S.W.2d 683, 4 A.L.R.2d 314 (1948) (purchaser of box of clothing at estate sale held not entitled to two valuable rings later found in bathrobe pocket).

[3]*See Bowen v. Sullivan,* 62 Ind. 281, 30 Am. Rep. 172 (1878) (finder of money in an unmarked envelope prevailed against the purchaser of the envelope; held it was unreasonable to believe that purchaser had bought the money in the envelope, when the envelope was among old papers the purchaser had bought to use in

owner may part with his title to money or goods through abandonment, gift, or sale, and the issue here is whether Mr. Sumstad's estate parted with title to the safe's contents through sale. There is no dispute that Mr. Sumstad's estate was the true owner of the $32,207 stored inside the locked safe sold to the Mitchells. If the Mitchells were mere finders of that money, then the estate would be entitled to prevail. The Mitchells are not mere finders, however, because the estate, through its agent the auctioneer, manifested an objective intent to pass title to the unknown contents of the safe along with the safe itself.

The unique facts of this case make it one of those apparently rare instances in history in which the objective manifestations of the contracting parties reflected a mutual assent to the sale of the unknown contents of the object sold. The function of a safe is to provide a place for storing one's money or other valuables. When a locked safe is sold without the key, under all of the circumstances present in this case, the reasonable expectations of the buyer should be protected.

Finally, this case presents an irresistible temptation to share the observations of an auction aficionado not of this court. Mr. Bellamy Partridge discusses the law concerning "Finds" in *Going, Going, Gone!* (1958), at page 174:

> These things [finds] are happening frequently wherever auctions are being held, which is practically everywhere. The auctioneers don't always know about them. Of course they knew about the one where at the end of the auction they sold the kitchen table the cashier had been using for a desk. It went for only a dollar or two,

manufacturing paper); *Livermore v. White,* 74 Me. 452, 43 Am. Rep. 600 (1883) (true owner of tanned leather hides unintentionally left in vats sold to third party prevailed against finder of hides); *Baugh v. Williams' Adm'r,* 264 Ky. 167, 94 S.W.2d 330 (1936) (the estate of the true owner of money hidden between the lining and bottom of a traveling bag prevailed against the purchaser of the traveling bag; the issue of whether there was a contract for the sale of bag's contents was not raised); *State ex rel. Scott v. Buzard,* 235 Mo. App. 636, 144 S.W.2d 847 (1940) (true owner of cash in metal box hidden in the wall of a residence prevailed against the finder of the box).

but some time after it had been taken away the cashier remembered that all the day's receipts were in the table drawer. And the law is that, unless expressly reserved, the contents go to the buyer with the container.

Had Mr. Partridge only been blessed with the prescience to include a citation to his conclusion, this dissent might not have been necessary.

Reconsideration denied September 8, 1980.

Review granted by Supreme Court November 7, 1980.