[No. 38418.    Department One.    November 3, 1966.]

Poweroil Manufacturing Company, Inc., *Appellant*, v.
Bob S. Carstensen *et al., Respondents.**

*Harvey Erickson* and *Ross Worthington*, for appellant.

*George T. Gagliardi, Walter K. Scott,* and *Hart Snyder,*
for respondents.

Hale, J.—Plaintiff corporation brought this action against
the individual members of its board of directors accusing
them of giving unlawful preference to themselves when
they voted to take quantities of the company's oil in re-
payment of their personal loans to the corporation. John
M. Eisen, president and majority stockholder, instigated
the litigation.

Mr. Eisen had developed a formula for blending oil, a
product which he sold largely around Spokane to various
garages and automobile dealers under the trade name of
"Poweroil." In February, 1960, he incorporated the business,
organizing the plaintiff, Poweroil Company, with an au-

*Reported in 419 P.2d 793.

thorized capital stock of $100,000 in 1,000 shares of common stock at a par value of $100, to manufacture, distribute and sell Poweroil. Eisen was elected president and his wife vice-president. He kept the formula.

Defendants later joined the new company as directors, paying par for their stock in individual amounts varying from $1,000 to $5,800. March 10, 1960, after defendants joined the board, the newly formed company made a contract with Mr. Eisen whereby the company would have the exclusive right to manufacture and sell Poweroil at wholesale and retail, the oil to be compounded under Eisen's direction according to his formula. The contract declared that the formula for mixing, blending and producing Poweroil should not be revealed to the corporation but should remain under Eisen's control during his lifetime; that he would not divulge it to anyone else; that it would be kept secret in a bank safety deposit box, and, upon his death, delivered to and become the property of the corporation.

Although defendants had paid cash for their stock, Eisen, as a part of the contractual consideration, received 510 shares, thereby acquiring 51 per cent of all of the capital stock. He agreed to compound and deliver a minimum of 7,000 gallons of Poweroil monthly to the company at actual cost of ingredients and production. For his services, the company agreed to pay him $600 monthly royalty with an additional royalty of 6.1 cents per gallon on any quantities in excess of the 7,000 gallons per month.

After execution of the agreement, Eisen, by letter, resigned both as president of the company and member of the board of directors, and the board accepted his resignation June 1, 1961, electing Director Udhus as his successor president.

The company did not prosper. To finance its operations and keep it going, defendant directors advanced to it the following amounts on the company's unsecured promissory notes: B. Carstensen, $6,500; S. Carstensen, $6,500; Kelleher, $8,000; Dimak, $1,000; Udhus, $1,800; Anderson, $800; and Manson $800. Eisen contributed no cash to the plaintiff corporation. By the end of 1961, the plaintiff company had,

in this fashion, borrowed from its directors $22,000, increased its total debt to $30,975, and incurred an overdraft at the bank of $1,013.47. In 22 months of operation, it had incurred an operating loss of $39,166.85. The directors, of course, during this interim, had received no dividends, recompense, interest or repayment on their loans, although the company had continued to pay Eisen the $600 per month royalty called for by the contract until a few months before a crucial meeting of the directors on March 24, 1962.

Defendants took the actions upon which this suit is founded during March, 1962. March 19th, Robert Carstensen, who had succeeded Udhus as president of the company, wrote Eisen on company letterhead insisting on a revision of the contract. He proposed that Eisen's stock be reduced from 510 to 150 shares; that the 6.1 cents royalty be withheld until the company received payment for the oil; that the oil formula be turned over to the board; and that the oil be mixed at a place more economical to the company's operation. The letter invited Eisen to attend a special meeting of the board of directors at the Poweroil warehouse at 4 p.m., March 24, 1962. Eisen agreed to the proposed changes in his contract only on condition that he be paid $30,000 cash for 400 shares of his stock. He said that, if his counter proposal were not met, he, as majority stockholder, intended to take over full control of Poweroil.

Eisen attended the March 24, 1962, special meeting of the board of directors where it was made clear to all present, including Eisen, that the company was insolvent, threatened with receivership, and had no funds with which to continue Eisen's royalty payments of $600 per month. The board then unanimously resolved to liquidate defendants' notes by delivering to themselves the oil on hand in payment of their notes.

Later, at the annual meeting of stockholders June 20, 1962, attended by both Eisen and his wife Kay, the notes held by defendants were itemized and enumerated, and the previous action taken by the board March 24, 1962, in voting to take the oil in payment of their notes, explained to the stockholders. Neither the minutes of the stockholders'

meeting of June 20, 1962, nor any other evidence show any objection by Eisens or others to the oil transaction.

Indeed, the minutes show, too, that, after a member of the board had explained the transaction of accepting oil in payment of the notes, "Kay Eisen requested surrender of the notes to the corporation" and "Jack Eisen said that he would like to have the seat and affairs of the company transferred from Seattle to Spokane, and voiced confidence that, under his leadership, the activity of the company can be revitalized and its business set to go forward on a profitable basis;" the minutes also state that "Kay Eisen moves that the present contract of the company with Jack Eisen be terminated as of June 20, 1962," a motion which the stockholders unanimously adopted. The minutes state, too, that Jack Eisen then nominated his wife Kay, himself, and one other to the board of directors and they were unanimously elected.

From the time of incorporation until June 1, 1961, John M. Eisen had served as president of plaintiff company, and he reassumed the presidency June 20, 1962. He had held a majority of the capital stock since execution of the contract March 20, 1960, and, following the shareholders' meeting of June 20, 1962, controlled the company.

At Eisen's instance, the company brought this action May 5, 1964, charging defendants with misappropriating corporate assets, voting themselves illegal preferences, voting on matters of corporate action in which their personal interests conflicted with those of the corporation, and in general accusing defendants of breach of their trust and wrongful conversion of company assets to their own use. No creditors, other than defendants, were apparently affected by the transaction, and none has appeared to declare that his claims were disparaged or prejudiced thereby. We assume from this record that no other creditors are concerned. Poweroil Manufacturing Company appeals the judgment dismissing its complaint at the close of all evidence.

The trial court made specific findings that, when defendants voted to distribute the oil to themselves in pay-

ment of the corporation's notes, there existed no market for Poweroil; that the price paid for the oil by defendants under the liquidation scheme was at the current wholesale price at which the corporation was selling to its distributors; that the defendants derived no personal gain from the transaction other than partial satisfaction of their claims of debt; and that the corporation sustained no legal damage from distributing the oil in this fashion.

The trial court also found that, after the June 20, 1962, stockholders' meeting, John M. Eisen and his wife were in control of and directed the corporate activity with full knowledge of the oil liquidation scheme. It made findings that, in the interim between that meeting and the commencement of this action, plaintiff corporation "acting through . . . John M. Eisen, during said period repurchased from defendants large quantities of oil for much less than the prices at which they had been taken," by the defendants in payment of their notes, and that "Plaintiff [Corporation] and said Eisens nevertheless took no steps to rescind or void said transaction nor to reclaim the oil while it was still available for recovery, at any time prior to instituting the above entitled action in May, 1964." The evidence supporting this finding showed that, after the shareholders' meeting of June 20, 1962, and prior to bringing this action, during a period when John M. Eisen controlled the plaintiff corporation, he repurchased from defendants about $7,000 worth of Poweroil for resale by the corporation to its customers.

This court has never departed from the statutory standards fixed by RCW 23.01.360 declaring that officers and directors shall be deemed to stand in a fiduciary relationship to the corporation which they have undertaken to serve. As fiduciaries, corporate directors and officers are bound to exercise the utmost good faith in furthering the interests of the corporation and conserving its property. *Central Bldg. Co. v. Keystone Shares Corp.*, 185 Wash. 645, 56 P.2d 697 (1936); *Larson v. A. W. Larson Constr. Co.*, 36 Wn.2d 271, 217 P.2d 789 (1950). And an officer or director may, in law, be deemed guilty of breaching the high

standards of conduct required of a fiduciary even where he acted without intent to defraud or injure the corporation. *State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co.,* 64 Wn.2d 375, 391 P.2d 979 (1964). The law thus promotes a high degree of fidelity between officer or director and his corporation.

But these rules do not prevent the corporation from ratifying and affirming the transactions it questions where, with full knowledge of the facts, it appears advantageous to the corporation to do so. *State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co., supra.* In *Sanders v. E-Z Park, Inc.,* 57 Wn.2d 474, 358 P.2d 138 (1960), a case concerning ratification of such a transaction, we said that "a particular director cannot vote on matters in which he has a personal financial interest. However, if he does, the action taken by the board is voidable only . . . and may be ratified by the stockholders."

Respondents argue laches, acquiescence, estoppel and ratification as separate defenses to the action urging that they combine to preclude recovery, but we think that the case may be decided on the basis of ratification alone. If the corporation affirmed and acted in furtherance of the contract, it ratified it and, thus, became bound by it. The right to rescind a voidable contract may be lost where there has been a waiver or ratification. Ratification means that one affirms that which he had a right to repudiate. Therefore, once ratification has been clearly established, we need not look further. And this is the rule even though the ratification be implied from the circumstances rather than expressly declared. 17 Am. Jur. 2d *Contracts* § 489.

That defendants were guilty of no concealment or failure to fully disclose to the corporation all material facts concerning the transaction, provides a distinctive feature to this case which markedly distinguishes it from *State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co., supra,* cited by appellants, for in that case a secret agreement to transfer stock in another corporation was concealed from the board of directors.

The trial court's express findings in the instant case, that

defendants made full advance disclosure of their intentions to distribute the oil to themselves in partial liquidation of their notes, in good faith, and at a fair price, removes this cause from the *Hayes Oyster Co., supra,* rationale.

For nearly two years, Poweroil had operated at a loss, largely on money first supplied by defendants through their cash purchase of stock and later by means of loans to the company on its unsecured notes. John Eisen, former president and still owner of a majority of the stock, knew this when he received an invitation to attend the directors' meeting of March 24, 1962. He knew that the debts represented by these notes constituted by far the major claims outstanding against the corporation and that the company was hopelessly insolvent. He was aware that the company faced immediate dissolution at defendants' instance under RCW 23.01.540, the statute providing for involuntary dissolution. Eisen preferred that the corporation continue its existence under his aegis in preference to extinction under theirs. Any chance looked better than none at all.

Therefore, considering the benefits inuring to the plaintiff corporation through the defendants' forbearance to end its existence, and their acceptance of oil in payment of their notes—bearing in mind that no intervening creditor's rights are affected—we see a good reason for its officers to ratify and affirm the very transaction which enabled it to continue its corporate life. Eisen's conduct on behalf of the corporation on learning of the impending transaction and in voicing no objections to it and in purchasing sizeable quantities of the oil in the regular course of business from defendants at less than wholesale prices over a period of nearly two years, coupled with his failure to take steps to vitiate or rescind the transaction after assuming management, control and direction of the company as president, majority stockholder, and member of the board of directors, amounted to an affirmance of and participation in the transaction constituting a ratification thereof by the corpo-

ration. *Peterson v. Eritsland, ante* p. 588, 419 P.2d 332 (1966).

Affirmed.

ROSELLINI, C. J., HILL and HUNTER, JJ., and LANGENBACH, J. Pro Tem., concur.