[No. 1214-2.    Division Two.    April 14, 1975.]

FLORENCE TAYLOR, *Individually and as Executrix, et al,* *Appellants,* v. FRANK T. SMITH *et al, Respondents.*

*Glenn E. Correa*, for appellants.

*Neil Lynch* and *Lynch & Lynch*, for respondents.

PEARSON, J.—This appeal raises the question of whether or not the evidence was sufficient to establish that a seller's real estate broker was clothed with the ostensible or apparent authority to collect the purchaser's monthly mortgage payments. We hold that the evidence was sufficient and therefore affirm the judgment of the trial court in the purchaser's favor.

A resume of the pertinent facts is required. During the summer of 1956, defendants Frank T. and Mary Lou Smith, then husband and wife, dropped in to the Olympia real estate office of Monroe Burnett in search of a place in which to live. At that time Burnett had an open listing on a 40-acre tract owned by plaintiff Florence Taylor and her husband, Eugene E. Taylor. The record reflects that the business of Taylor was the purchase and sale of real estate and timber, that Taylor's property holdings were extensive, and that he had frequently utilized the services of Burnett as a real estate broker.

An earnest money receipt and agreement covering only a 5-acre portion of the tract was prepared by Burnett, signed by the Smiths, and taken to the sellers by Burnett. The pertinent provisions of that agreement required a payment of $50 cash as earnest money, a total purchase price of $2,500 with payments of $30 per month, and the contract to be left in escrow with Burnett until the balance was reduced to $2,000. At that time the sellers were required to deliver satisfactory title insurance to the purchasers. Although the purchasers testified that this agreement was

accepted and signed by the sellers, which they deny, only a copy unsigned by the sellers was introduced in evidence. The purchasers' testimony, however, is uncontroverted that payments were made to Burnett pursuant to this agreement, and a credit for the amount of such payments was allowed by the sellers on a $500 down payment the purchasers were required to advance when they subsequently entered the contract for the sale of the entire 40-acre parcel now in dispute.

The contract on the larger tract of property was entered approximately 10 months after preparation of the initial earnest money agreement on the 5 acres. Again, the negotiations and preparation of the contract were performed by Burnett. In fact it is clear that the purchasers never met or spoke with either of the sellers until the instant controversy ensued, more than 10 years later.

The real estate contract executed by the parties acknowledged receipt of $500 as a down payment on the $4,000 purchase price, required monthly payments of $35, and required that the sellers furnish title insurance after the unpaid balance was reduced to $3,000. The purchasers were required to pay all taxes and assessments. This contract, however, contrary to the first earnest money agreement, contained no provision for installment payments to Burnett as an escrow agent. The only evidence in the record regarding the intent of the parties as to the omission or inclusion of such a provision is the testimony of Mrs. Smith that there had been no change in the directions to Burnett as to whom the payments were to be made.

Despite the absence of a provision for payments to Burnett, as in the first earnest money agreement, it is undisputed that the $500 down payment on the 40 acres, less the credit for monthly payments previously made to Burnett on the 5-acre parcel, was paid to Burnett by the Smiths and was received by the Taylors. Thereafter, in accordance with what had then become an established practice, the purchasers delivered payments to Burnett, who each time

personally gave a receipt to the purchasers. The purchasers continued making their payments in this manner from July 3, 1957, until June 12, 1967, a period of nearly 10 years. Mrs. Smith testified that she discontinued making payments because the principal balance had been reduced to $2,600, the real estate contract required the sellers to furnish title insurance after the balance was reduced to $3,000, and this the sellers had not done.

The record reflects that Eugene E. Taylor, who had been the active manager of the Taylors' real estate holdings, died in April of 1965. After his death, his interest in the property in dispute descended to Mrs. Taylor, who formed a real estate corporation along with the deceased's two sons, so that the ownership of the vendor's interest in the property is now held by the corporation, in which Mrs. Taylor and her sons have equal interests.

According to the Taylors, the first time they learned of the existence of the unrecorded real estate contract on this 40-acre parcel was in March of 1968, when Mrs. Smith approached Edwin W. Taylor, one of the sons, to discuss the failure of the sellers to provide title insurance. Shortly after this conversation, the sellers advised Mrs. Smith that unless she paid the entire purchase price of $3,500 they would foreclose. The sellers contended that despite the receipts signed by Burnett, to their knowledge none of the purchasers' monthly payments was ever received by the sellers. The instant litigation then ensued.

Although Burnett was evidently available at the time of trial, he was neither subpoenaed nor called to testify by either party. From the record before us it is absolutely impossible to determine what happened to the payments received from the purchasers by Burnett. The payments were either forwarded to the sellers, perhaps only until Eugene Taylor's death, unbeknownst to the plaintiffs, or retained by Burnett from the inception. It is known that the taxes on the property from 1964 to 1971 were paid by the sellers rather than by the purchasers, which supports the

contention that the *plaintiff* sellers, at least, were unaware of the existence of the unrecorded real estate contract.

Based upon the foregoing evidence, the trial court found that during Eugene E. Taylor's lifetime, Burnett, in receiving payments on the contract, was acting as the agent of the sellers, that the contract balance had been reduced below $3,000, and that the sellers were in default for having failed to furnish the required title insurance. The court further found that the purchasers were in default for having failed to pay the required taxes in the years 1964-71. The court's judgment required the purchasers to pay the back taxes, as well as the amount due on the contract subsequent to Taylor's death. Upon receipt of such payment, the sellers were required by the judgment to deliver the deed and title insurance specified in the contract.

From this judgment the sellers appeal, challenging the court's ruling that Burnett was the agent of the sellers for the purpose of collecting the monthly installment payments. The purchasers do not question the court's conclusion that such agency terminated upon the death of Taylor in April of 1965.

We believe that the trial court properly applied the law to the facts before it in determining the issue of Burnett's authority to receive the purchaser's payments, and for that reason we affirm the judgment.

To explain the basis for our holding, we may start with the general and basic proposition that when the Taylors listed the property in dispute for sale, with Burnett as their broker, Burnett became the agent of the sellers. *Mersky v. Multiple Listing Bureau of Olympia, Inc.*, 73 Wn.2d 225, 228, 437 P.2d 897 (1968); *Brink v. Martin*, 50 Wn.2d 256, 310 P.2d 870 (1957). The question then becomes whether Burnett, pursuant to his agency relationship, had the actual or apparent authority to receive payments from the purchasers on behalf of the sellers.

The sellers argue that a real estate broker is a special agent with limited powers and with authority closely restricted within the terms of the agency. It has been so held.

*Stenson v. Thrush*, 36 Wn.2d 726, 728, 219 P.2d 977 (1950); *Kosten v. Fleming*, 15 Wn.2d 523, 526, 131 P.2d 170 (1942); *see* 3 Am. Jur. 2d *Agency* § 119 (1962). It has also been held that as a general rule, under the ordinary powers given a real estate broker by a seller, the broker is not authorized to accept the purchase money as agent of the sellers. *American Bonding Co. v. Dowell*, 31 Wn.2d 585, 593, 198 P.2d 191 (1948); Annot., *Payment to Broker or Agent*, 30 A.L.R.2d 805 (1953); 12 Am. Jur. 2d *Brokers* § 79 (1964); 3 Am. Jur. 2d *Agency* § 125 (1962).

There are, however, exceptions to the general rule, and agents are not always given only the *ordinary* powers of a real estate broker. For example, it should be obvious that an agent, in conjunction with his authority to sell real estate, may be *expressly* authorized to receive payment, or the *actual* authority to receive a payment from the purchaser may be implied under the circumstances. *Hardinger v. Blackmon*, 13 Wn.2d 94, 124 P.2d 220 (1942); 3 Am. Jur. 2d *Agency* § 125, *supra*. In the *Hardinger* case, a realty company had been given authority by the owner to collect rental payments under a lease-option agreement which contained the following provision:

> "If the lessee exercises the option to purchase said property and pays an additional sum of $100.00 or more upon the purchase price, then the Columbia Real Estate Co. shall be entitled to retain the sum of $72.50 as and for their commission in said matter, and pay the balance of $27.50 to C. T. Hardinger . . . ."

*Hardinger v. Blackmon*, *supra* at 104. The court held that the agent had at least impliedly been granted the actual authority to receive the lessee's initial payment in exercise of the option.

A further exception to the general rule discussed above, and an exception we find applicable to the case at bar, is the rule applicable when the real estate broker is clothed by the principal with an indicia of authority, or *apparent* authority to receive payment. This exception was recognized in *American Bonding Co. v. Dowell*, *supra*, and

applied in an early case where a real estate agent had been clothed with the apparent authority to transfer a deed as well as to receive payment, and the loss occasioned by the agent's delivery of a fraudulent deed and embezzlement of the purchase price was placed upon the principal seller. *Dickson v. Phillips*, 131 *Wash* 633, 230 P. 630 (1924); *see* Annot. 30 A.L.R.2d 805, *supra*, section 9.

█ It is clear that the authority of an agent is not "apparent" in contemplation of law, merely because it looks so to the person with whom he deals. Rather,

> [f]acts and circumstances are sufficient to establish apparent authority *only* when a person exercising ordinary prudence, acting in good faith and conversant with business practices and customs, would be misled thereby, and such person has given due regard to such other circumstances as would cause a person of ordinary prudence to make further inquiry.

*Lamb v. General Associates, Inc.*, 60 Wn.2d 623, 627, 374 P.2d 677 (1962); *Deers, Inc. v. DeRuyter*, 9 Wn. App. 240, 243, 511 P.2d 1379 (1973). In other words, an objective test of what constitutes apparent authority is required. *Largent v. Ritchey*, 38 Wn.2d 856, 861, 233 P.2d 1019 (1951). A concise and frequently repeated statement of this test is found in *Larson v. Bear*, 38 Wn.2d 485, 230 P.2d 610 (1951), at page 490:

> An agent may have what is termed "apparent" authority. It exists when, though not actually granted, the principal knowingly permits the agent to perform certain acts, or where he holds him out as possessing certain authority; or, as sometimes expressed, when the principal has placed the agent in such position that persons of ordinary prudence are led to believe and assume that the agent is possessed of certain authority, and to deal with him on reliance of such assumption.

(Citations omitted.) Applying the foregoing rules to the facts at hand, it may be seen that from the outset Burnett was placed in a position and permitted to perform acts with the inevitable result that persons of ordinary prudence would be led to believe he possessed the authority he pur-

ported to exercise. It is undisputed that the entire negotiations as to two separate real estate transactions were conducted on behalf of the sellers by Burnett, and at no time was it necessary for the purchasers to speak with or meet the sellers directly. Although the plaintiff sellers contend that the original earnest money agreement regarding the 5-acre parcel was neither signed nor accepted by them, there is substantial evidence in the record that the purchasers made monthly payments to Burnett toward the purchase of the 5 acres, that these payments were received by the sellers, and moreover that this method of payment was specifically approved or acquiesced in by the sellers, as evidenced by the fact that credit for these payments was given the purchasers toward the $500 down payment required for purchase of the larger 40-acre parcel. Furthermore, the balance of the $500 down payment, which Smith paid in cash, was also paid to Burnett, who wrote the purchasers a receipt made payable to the contract in dispute. The sellers acknowledge that this down payment was in this manner received by them.

From the dealings between the parties with regard to the initial transaction involving the 5 acres, and from the manner in which the contract for the sale of the property now in dispute was consummated, the purchasers were thus led to believe that any payments required of them should be made to the sellers' agent, Burnett. From the inception of their relationship with the sellers, every payment the purchasers made was to the sellers' agent, and at no time did the purchasers receive any indication that the sellers did not intend this established practice to continue. For over 10 years the sellers allowed Burnett to remain in the position of ostensible authority in which they had placed him. For over 10 years the purchasers resided upon a portion of the property, made their regular installment payments on the contract, and personally received a receipt from the sellers' agent therefor. At no time did the purchasers receive knowledge of any facts which should have caused them to

make further inquiry. Given the established course of conduct whereby the initial payments were made to the sellers' agent and received by the sellers, and the sellers' failure over a 10-year period of time to inform the purchasers that monthly payments required by the real estate contract were not being received as they had been in the past, our holding must be that the purchasers were entitled to rely on the assumption that Burnett possessed the authority he appeared to have been given by the sellers.

As to the sellers' contention that the purchasers should bear the loss in this case because they had made the broker their agent, there is no evidence in the record to indicate that once this contract was entered, the established agency relationship between the sellers and their broker terminated, and a new relationship was formed between the broker and the purchasers. Nor is there any evidence in the record to bring this case within the rule discussed in *Schrock v. Gillingham*, 36 Wn.2d 419, 219 P.2d 92 (1950), whereby the loss occasioned by a third party embezzler has fallen upon the purchaser, not because he was the purchaser but because he had executed escrow instructions directing the third party not to deliver the money to the seller until certain conditions had been performed by the seller. Under those circumstances the defaulting party may be said to be the agent of the purchaser. The rule is inapposite here.

The judgment is affirmed.

PETRIE, A.C.J., and ANDERSEN, J., concur.