[No. 3121-1. Division One. May 10, 1976.]

VERNON BARNES, ET AL, *Appellants,* v. WARREN TREECE, ET AL, *Respondents.*

*Oberquell & Ahlf* and *Kenneth R. Ahlf,* for appellants.

*Warner, Pierce & Peden* and *Leo J. Peden,* for respondents.

CALLOW, J.—The plaintiffs Barnes appeal, and the defendant Warren Treece cross-appeals, from a judgment entered in plaintiffs' breach of contract action against Treece and the defendant Vend-A-Win, Inc. The plaintiffs appeal from the portion of the judgment dismissing Vend-A-Win from the action with prejudice and assert that Vend-A-Win either clothed Treece with apparent authority or ratified the contract made by him. Treece cross-appeals from the portion awarding plaintiffs a $100,000 judgment against him personally and claims that no contract was ever formed. We affirm the trial court's holding that Treece was personally liable on a valid, enforceable contract, but that he did not have apparent authority to enter into the contract on behalf of the corporation and Vend-A-Win did not ratify the contract.

Vend-A-Win is a Washington corporation engaged primarily in the business of distributing punchboards. Warren Treece served as vice-president, was a member of the board of directors, and owned 50 percent of the stock of Vend-A-Win. On July 24, 1973, Treece spoke before the Washington State Gambling Commission in support of punchboard legitimacy and Vend-A-Win's particular application for a temporary license to distribute punchboards. During the testimony, as stated by the trial judge, Treece made a statement to the following effect:

I'll put a hundred thousand dollars to anyone to find a crooked board. If they find it, I'll pay it.

The statement brought laughter from the audience.

The next morning, July 25, 1973, the plaintiff Barnes was watching a television news report of the proceedings before the gambling commission and heard Treece's previous statement that $100,000 would be paid to anyone who could produce a crooked punchboard. Barnes also read a newspaper report of the hearings that quoted Treece's statement.

A number of years earlier, while employed as a bartender, Barnes had purchased two fraudulent punchboards. After learning of Treece's statement, Barnes searched for and located his two punchboards. On July 26, 1973, Barnes telephoned Treece, announced that he had two crooked punchboards, and asked Treece if his earlier statement had been made seriously. Treece assured Barnes that the statement had been made seriously, advised Barnes that the statement was firm, and further informed Barnes that the $100,000 was safely being held in escrow. Treece also specifically directed Barnes to bring the punchboard to the Seattle office of Vend-A-Win for inspection.

On July 28, 1973, Barnes traveled to Seattle, met Treece and Vend-A-Win's secretary-treasurer in Vend-A-Win's offices, produced one punchboard, and received a receipt for presentation of the board written on Vend-A-Win stationery, signed by Treece and witnessed by Vend-A-Win's secretary-treasurer. Barnes was informed that the punchboard would be taken to Chicago for inspection. The parties next met on August 3, 1973, before the Washington State Gambling Commission. Barnes produced his second punchboard during the meeting before the commission.

Both Treece and Vend-A-Win refused to pay Barnes $100,000. Barnes then initiated this breach of contract action against both defendants. The trial court found that the two punchboards were rigged and dishonest, that Treece's statements before the gambling commission and reiterated to Barnes personally on the telephone constituted a valid offer for a unilateral contract, and that Barnes' production of two dishonest punchboards constituted an acceptance of the offer. The trial court also found that Vend-A-Win had not manifested any apparent authority in Treece to make the offer, had not impliedly ratified the contract, and therefore was not liable on the contract.

The following questions are. presented on appeal: (1) Did Barnes and Treece mutually manifest assent to an agreement that formed an enforceable contract, and if so, (2) was the corporation Vend-A-Win bound under the con-

tract either by having invested Treece with apparent authority to thus contract in its behalf or by later ratifying the agreement?

The first issue is whether the statement of Treece was the manifestation of an offer which could be accepted to bind the offeror to performance of the promise. Treece contends that no contract was formed. He maintains that his statement was made in jest and lacks the necessary manifestation of a serious contractual intent.

When expressions are intended as a joke and are understood or would be understood by a reasonable person as being so intended, they cannot be construed as an offer and accepted to form a contract. However, if the jest is not apparent and a reasonable hearer would believe that an offer was being made, then the speaker risks the formation of a contract which was not intended. It is the objective manifestations of the offeror that count and not secret, unexpressed intentions. 1 A. Corbin, *Corbin on Contracts* § 34 (1963); 1 S. Williston, *A Treatise on the Law of Contracts* § 21, at 43 (3d ed. 1957). As stated in *Wesco Realty, Inc. v. Drewry*, 9 Wn. App. 734, 735, 515 P.2d 513 (1973):

> If a party's words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of the party's mind on the subject.

*See also Swanson v. Holmquist*, 13 Wn. App. 939, 539 P.2d 104 (1975); *Peoples Mortgage Co. v. Vista View Bldrs.*, 6 Wn. App. 744, 496 P.2d 354 (1972).

The trial court found that there was an objective manifestation of mutual assent to form a contract. This was a matter to be evaluated by the trier of fact. *In re Estate of Richardson*, 11 Wn. App. 758, 525 P.2d 816 (1974). The record includes substantial evidence of the required mutual assent to support the finding of the trial court. Although the original statement of Treece drew laughter from the audience, the subsequent statements, conduct, and the circumstances show an intent to lead any hearer to believe the

statements were made seriously. There was testimony, though contradicted, that Treece specifically restated the offer over the telephone in response to an inquiry concerning whether the offer was serious. Treece, when given the opportunity to state that an offer was not intended, not only reaffirmed the offer but also asserted that $100,000 had been placed in escrow and directed Barnes to bring the punchboard to Seattle for inspection. The parties met, Barnes was given a receipt for the board, and he was told that the board would be taken to Chicago for inspection. In present day society it is known that gambling generates a great deal of income and that large sums are spent on its advertising and promotion. In that prevailing atmosphere, it was a credible statement that $100,000 would be paid to promote punchboards. The statements of the defendant and the surrounding circumstances reflect an objective manifestation of a contractual intent by Treece and support the finding of the trial court.

The trial court properly categorized Treece's promise of $100,000 as a valid offer for a unilateral contract. The offer made promised that a contract would result upon performance of the act requested. Performance of the act with the intent to accept the offer constituted acceptance. The trial judge entered a specific finding that Barnes performed the requested act of acceptance when he produced a rigged and fraudulent punchboard. We concur with the trial court's holding that a binding unilateral contract was formed between Barnes and Treece and uphold the conclusions of the trial court in that regard.

Treece also contends that an oral contract would be unenforceable pursuant to two statute of frauds provisions of the Uniform Commercial Code, RCW 62A.1-206 and RCW 62A.2-201. However, both provisions apply only to contracts for the sale of personal property or goods. Since the contract involved is not a sales transaction, the U.C.C. statute of frauds provisions are inapplicable.

In addition, Treece asserts that the contract is unenforceable due to an unconscionable discrepancy in con-

sideration. However, it is only when consideration is so inadequate as to be constructively fraudulent that a court should inquire into the comparative value of an act performed in response to a promise. *Browning v. Johnson*, 70 Wn.2d 145, 422 P.2d 314 (1967); *Rogich v. Dressel*, 45 Wn.2d 829, 278 P.2d 367 (1954). The record does not suggest constructive fraud, and therefore the adequacy of the consideration cannot be weighed.

The last question presented is whether Vend-A-Win is also liable on the contract either because of the claim that the contract was made within an apparent authority given Treece or because of an implied ratification of the contract by Vend-A-Win.

 Treece, as a corporate vice-president, was an agent of Vend-A-Win and agency principles apply to his acts. *Sons of Norway v. Boomer*, 10 Wn. App. 618, 519 P.2d 28 (1974). Vend-A-Win, therefore, may be bound to a contract made by Treece if the contract was within the scope of his apparent authority as a corporate vice-president. *Lumber Mart Co. v. Buchanan*, 69 Wn.2d 658, 419 P.2d 1002 (1966); *Taylor v. Smith*, 13 Wn. App. 171, 534 P.2d 39 (1975); *Deers, Inc. v. DeRuyter*, 9 Wn. App. 240, 511 P.2d 1379 (1973). Vice-presidents do not have authority to bind their corporations by virtue of their office. H. Henn, *Law of Corporations* § 225 (2d ed. 1970). Apparent authority to bind a corporation in contract exists only if the corporation, as the principal, knowingly permits the agent to act or holds the agent out as having authority. *Ford v. United Bhd. of Carpenters*, 50 Wn.2d 832, 315 P.2d 299 (1957). In order for a corporation to be bound by the apparent authority of its officers, it must have acted or conducted itself in a manner that manifested to third persons that the agent had authority. *Lumber Mart Co. v. Buchanan, supra*. To constitute a manifestation of an agent's apparent authority by the principal, the circumstances must be such that a prudent person would have believed that the agent possessed the authority to do the particular act in question. *Walker v. Pacific Mobile Homes, Inc.*, 68 Wn.2d 347, 413

P.2d 3 (1966). The manifestation must be sufficient to mislead a reasonable person, to deter further inquiry, and to cause reliance on the manifestation of apparent authority. *Lamb v. General Associates, Inc.*, 60 Wn.2d 623, 374 P.2d 677 (1962); *Taylor v. Smith, supra*; *Deers, Inc. v. DeRuyter, supra.*

The corporation did not manifest to Barnes that Treece had authority to offer $100,000 for the production of an illegal punchboard. Barnes, as a reasonable, prudent individual, did contact Treece to ascertain whether the offer was serious, but he never inquired of Vend-A-Win concerning whether Treece had any authority to bind the corporation. Whether an agent has apparent authority to make a contract depends upon the circumstances and is to be decided by the trier of fact. *Sons of Norway v. Boomer, supra*; *Louron Indus., Inc. v. Holman*, 7 Wn. App. 834, 502 P.2d 1216 (1972); 2 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 451 (perm. ed. rev. 1969). The finding of the trial court that Treece did not have apparent authority to make the contract is supported by the record.

As asserted by the plaintiff, a corporate principal may impliedly ratify an unauthorized contract of an officer agent. *Rayonier, Inc. v. Polson*, 400 F.2d 909 (9th Cir. 1968); *Poweroil Mfg. Co. v. Carstensen*, 69 Wn.2d 673, 419 P.2d 793 (1966). Whether an implied ratification has occurred is likewise to be decided by the finder of fact. 2 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 781 (perm. ed. rev. 1969).

An implied ratification can arise if the corporate principal, with full knowledge of the material facts (1) receives, accepts, and retains benefits from the contract, (2) remains silent, acquiesces, and fails to repudiate or disaffirm the contract, or (3) otherwise exhibits conduct demonstrating an adoption and recognition of the contract as binding. 2 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 752 *et seq.* (perm. ed. rev. 1969). The basic inquiry to determine whether an implied ratification has occurred is whether the facts demonstrate an intent to affirm, to ap-

prove, and to act in furtherance of the contract. *Poweroil Mfg. Co. v. Carstensen, supra.*

Barnes asserts that Vend-A-Win impliedly ratified the contract through acquiescence by remaining silent and failing to repudiate or disaffirm the contract. Fletcher comments that:

Ratification, being purely a voluntary act upon the part of the principal, ordinarily requires some positive act. But the rule that when a principal has not disaffirmed an unauthorized act of his agent within a reasonable time after it came to his knowledge, he will be deemed to have acquiesced in such act, applies to corporate bodies as well as individuals. Ratification may be implied, or the corporation be held estopped to deny ratification, from acquiescence on the part of the corporation. When the officers or agents of a corporation exceed their powers in entering into contracts or doing other acts, the corporation, when it has knowledge thereof, must promptly disaffirm the contract or act and not allow the other party or third persons to act in the belief that it was authorized or has been ratified. If it acquiesces, with knowledge of the facts, or fails to disaffirm, a ratification will be implied, or else it will be estopped to deny a ratification. In other words, acquiescence with the full knowledge of the facts is equivalent to ratification of unauthorized acts of corporate officers or directors. After knowledge of the unauthorized contract, the corporation must repudiate it within a reasonable time or else consent and approval will be presumed to have been given to the officer's act or contract. But one should be aware of the probability that delay may mislead another before he will be estopped because of delay. Of course there is no acquiescence where the corporate officers promptly repudiate an agreement made without authority by a subordinate officer or agent, or where the circumstances of the case sufficiently account for the silence of the principal without construing it as an acquiescence in the act. Furthermore, acquiescence implies knowledge. If there is no knowledge, there is no acquiescence. A ratification by acquiescence cannot arise where the party supposed to acquiesce has not a full knowledge of the facts, or unless he occupies such a relation that knowledge of it must be imputed to him. Moreover, silence and failure to repudiate which does not harm the opposite party does not

constitute ratification by estoppel. Where such a ratification is sought to be established by a third person, it must clearly appear that he has been misled thereby, or induced to forego some advantage he would have otherwise enjoyed. Accordingly, it is held that the duty promptly to disaffirm unauthorized acts, on knowledge thereof being acquired, is less imperative, or does not exist, where the corporation has received no benefit from the acts and no loss is caused to the other party and his position is not in any way changed by the failure to notify him.

(Footnotes omitted.) 2 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 769 (perm. ed. rev. 1969).

There is no evidence that Vend-A-Win received and retained benefits from the contract nor that Barnes was misled, changed his position, and suffered loss as a result of either the actions or silence of the corporation. Further, the first mention of $100,000 for a "crooked board" was made on July 24, the plaintiff presented his punchboards to Treece at the corporation's office on July 28, and the plaintiff's complaint was filed on August 7, 1973. Little time existed for the corporation to act to repudiate the offer of its vice-president. This substantiates the finding of the trial court, whose province it was to find whether the corporation adopted the unauthorized act of its agent by its silence. Though we might have evaluated the evidence differently, the ascertainment of the existence of either an intent to ratify or an estoppel because of silent acquiescence was within the province of the trial court.

The judgment is affirmed.

JAMES and ANDERSEN, JJ., concur.