[No. 24255. Department One. January 5, 1934.]

STRANGE & COMPANY, *Appellant*, v. PUGET SOUND MACHINERY DEPOT, *Respondent*.[1]

*Hayden, Merritt, Summers & Bucey,* for appellant.
*Wright, Jones & Bronson,* for respondent.

MILLARD, J.—Strange & Company, a domestic corporation, is engaged in the business of chartering steamships. The Puget Sound Machinery Depot, a domestic corporation, is engaged in the business of

[1]Reported in 28 P. (2d) 111.

manufacturing boilers, machinery, etc. In October, 1930, the first named corporation, as charterer, was in control and operation of the steamship "Mary D," and was in the market for cargo for that vessel. At that time, the Puget Sound Machinery Depot, as a buyer and shipper of steel plates, was in the market for vessel space at the cheapest rate available. On October 15, 1930, the charterer telephoned the machinery corporation concerning the matter of steamship space for steel plates to be shipped from the east coast. By letter of the same date, the plaintiff charterer advised the defendant:

"SS Mary D.

"Confirming telephone conversation with your Traffic Manager this morning.

"We have the above American steamer leaving Baltimore about the last ten days in November, coming back to this coast in ballast, unless we can secure paying cargo.

"She is admirably suited for handling long plates and other steel products, so if you are interested in shipping a substantial quantity at attractive rates we will be glad to hear further from you."

A conversation thereafter between plaintiff's president (W. A. Strange) and defendant's traffic clerk (F. C. Treffinger) resulted in the delivery of the following letter to Treffinger:

"Seattle, October 20, 1930
"Puget Sound Machinery Depot,
"Seattle, Washington.
"Gentlemen:          SS Mary D.

"This will confirm conversation between writer and your Mr. Treffinger this date, wherein you have booked with us 3300 tons steel plates to be loaded to the above steamer at Baltimore, Maryland, on or about November 24th, all for discharge at Seattle, at the rate of $4.50 per short ton.

"You have the option of discharging a minimum of

1500 tons at Portland, freight rate to be $4.75 per 2000 lbs.

"It is our understanding that very few, if any, plates will exceed 40 feet in length and 5000 lbs. each. These plates are to be loaded from open cars at Baltimore and discharged into open cars or pier, whichever you elect, at Seattle or Portland.

"*Our regular contract will be sent you in due course.*

"Yours very truly,

"Strange & Company, Inc.

(Italics ours).               "W. A. Strange."

Mr. Treffinger wrote the following in the lower left-hand corner of the letterhead:

"Excepted.   F. C. Treffinger 10/20/30."

On October 21, 1930, plaintiff wrote the following letter to defendant:

"Mr. F. C. Treffinger, Traf. Mgr.,
"Puget Sound Machinery Depot,
"Seattle, Washington.
"Dear Sir:

"We enclose herewith our Contract No. 62, covering your booking of 3300 short tons steel plates for loading at Baltimore, Md., to the S. S. Mary D.

"Kindly send us two signed copies by return mail for our files.      Yours very truly,

"Strange & Company, Inc.

"W. A. Strange."

The contract enclosed within the foregoing letter of transmittal reads, so far as material, as follows:

"Strange & Co., Inc.
"Shipping
"White-Henry-Stuart Building,
"Seattle, Wash.

"Oct. 20th, 1930.

"Messrs. Puget Sound Machinery Depot,
"Seattle, Washington.
"Dear Sirs:

"We confirm, subject to conditions hereinafter stated, your engagement of space on the first class

American S/S Mary D expected to be ready to load about November 24, 1930.

"Commodity and Quantity: 3300 tons Steel Plates.

"Loading Port: Baltimore, Md.

"Rate of Freight:
"Destination:
$4.50 per ton of 2000 lbs., Seattle, Wash., shippers option minimum 1500 tons discharge Portland, Oregon at $4.75.

"Remarks: Wharfage loading and discharging for account of cargo. It is our understanding that very few, if any, plates will exceed 40 feet in length and 5000 lbs each. These plates are to be loaded from open cars at Baltimore and discharged into open cars or pier, whichever you elect, at Seattle or Portland. . . . 12. *This confirmation of engagement when signed becomes a binding contract* which cannot be altered or cancelled except by mutual consent in writing.

"Please sign and send duplicate copy to us by return mail.

"Accepted: "STRANGE & COMPANY, INC.

" ............................................................... By W. A. Strange.

" ...............................................19......... "

(Italics ours).

Defendant did not sign the contract. On or about November 1st or 5th, 1930 (the testimony conflicts as to which is the correct date), Treffinger informed the plaintiff that defendant would not furnish cargo to the steamship "Mary D."

On November 14, 1930, plaintiff wrote the following letter to defendant:

"On October 21st we mailed you our regular printed form of space engagement with request for signature by you. We presume that your failure to return two copies of the contract with your signature, as requested by us, is a reflection of your desire to avoid the obligation to supply the steel, which was orally suggested by you in conversation about the sixth of this month.

"However, as indicated to you at that time, irrespective of the execution of our usual printed contract, you are bound morally and legally to supply the cargo

under firm booking evidenced by our letter of October 20th accepted by you.

"If, notwithstanding your booking with us, you are either unable or unwilling to furnish the steel, we request prompt definite written notice of that fact so that the expense of demurrage, incident to tendering the ship to you, may be avoided; so that we may have the greatest remaining opportunity to acquire substitute cargo, if any is available; and so that our claim against you for breach of contract may be minimized."

Insisting that the letter of October 20th was a mere option or quotation, and denying any obligation thereunder to accept space on the "Mary D," defendant wrote plaintiff as follows under date of November 17, 1930:

"We have your letter of November 14th.

"At no time has our negotiation with you amounted to more than an option or quotation to us upon which we might act in moving certain steel, which we expected to purchase. As our Mr. Treffinger advised you on November 5th, this steel will not be available for shipment, and therefore, the option, which existed at that time, would not be exercised.

"We wish to say further that never at any time was there any engagement on our part, either oral or written, to accept this space, which situation was very clearly recognized in Par. 12 of the contract which you sent us, providing that the same should become binding upon our signature."

This action was instituted to recover for damages claimed to have been sustained by the plaintiff as the result of defendant's breach of contract. It was alleged that the contract breached was one of affreightment in the form of a letter dated October 20, 1930, signed by plaintiff, addressed to defendant and accepted in writing on behalf of the defendant by F. C. Treffinger, an employee of defendant. The defense was that the parties never entered into any contract;

that the letter of October 20, 1930, was a mere option or quotation.

The cause was tried to the court, which found that, for several days prior to October 20, 1930, the plaintiff, through its president, and the defendant, through its agent, were negotiating for a booking contract of affreightment covering shipment of steel plates from Baltimore, Maryland, to Seattle, aboard the steamship "Mary D." The court further found that it had been orally understood and agreed between Strange and Treffinger, in addition to the language quoted in the letter of October 20, 1930, that the regular booking contract be sent by the plaintiff to the defendant; and

"That at no time upon October 20, 1930, or prior thereto, had the defendant examined said form of booking contract or form of plaintiff's regular bill of lading mentioned therein; that the defendant at no time requested or sought to examine plaintiff's regular form of bill of lading; that the defendant at no time sought or requested to examine plaintiff's regular form of booking contract, prior to actual receipt thereof on or after October 21, 1930.

"That . . . defendant never accepted all of the provisions contained in plaintiff's regular form of booking contract, and never accepted all of the provisions contained in plaintiff's regular bill of lading, mentioned therein."

Concluding that the plaintiff and defendant never entered into a contract, the trial court entered judgment of dismissal. Plaintiff has appealed from that judgment.

Was the letter of October 20, 1930, intended by the parties to be a contract? That is the determinative question on this appeal. A negative answer to that question obviates the necessity of inquiry into matters of custom or usage relating to the terms or extent of the contract.

The testimony is in sharp conflict on the question of the intention of the parties. However, the trial court's conclusion is amply supported. The testimony on behalf of the appellant is to the effect that no conversation was had by its representative with Treffinger concerning the transmittal of a formal contract to the respondent. Treffinger testified that, on October 20, 1930, he requested, and it was agreed, that a formal contract be sent to the respondent; that, until such contract was signed and returned by an officer of respondent corporation, it

"  .   .   .   could not be considered a definite booking. . . . I told him I wanted the confirmation for the approval of the officers of our company. I signed my name to this original letter after I had asked him about the formal contracts, and he said that he would mail those later on. He also handed me a formal contract, and I told him at that time that the tonnage would not be available, and could not be available to move until the formal contract was executed by the officers of the company. I told him the formal contract would be returned to him after it was signed by the officers of the company. . . . That was the only way I could handle it. . . . I told him I couldn't sign any contracts for the Puget Sound Machinery Depot.''

It is of some significance—tends to show that the letter was not intended to be a contract—that no typewritten provision for acceptance appears on the letter. The original, which was delivered to the respondent, has nothing thereon indicating an acceptance. The acceptance by Treffinger, which he testified meant no more than that the rates quoted were acceptable if the shipment was made, appears on the carbon copy retained by appellant.

If, as appellant's president testified, the parties agreed earlier in the day as to all of the details, it is difficult to understand why the appellant did not pre-

pare the formal contract and deliver it, instead of the letter, that afternoon (October 20th) to Treffinger and definitely close the contract that day. The fact that, instead of a contract, the letter of October 20th was delivered to Treffinger, tends to corroborate the testimony of Treffinger that the formal contract was to be submitted to, and signed by, the respondent before the deal would be closed. Until the formal contract was signed by the respondent in confirmation of the engagement, there was no binding contract. The formal contract so provides in paragraph 12 thereof—"This confirmation of engagement when signed becomes a binding contract." That contract was never signed by the respondent.

The provision in the letter, "our regular contract will be sent you in due course," indicates, at least on its face, that the letter was never intended to be the contract of the parties.

In the case of *Stanton v. Dennis,* 64 Wash. 85, 116 Pac. 650, the plaintiff brought an action to recover on an agreement based on a letter reading in part as follows:

"Confirming our conversation with you over long distance phone this afternoon we propose to furnish all labor for setting mill work and carpentry on the addition . . .
"Formal contract to follow.
"Accepted: ................................................
>                         "Phil E. Dunnavant & Co.
>                         "Per Phil E. Dunnavant."

Upon receipt of the letter, the addressee signed his name after the word "accepted" and returned the letter. No formal contract was ever forwarded for execution, and the parties did not enter into any other contract, but thereafter the defendant prosecuted the work

described in the letter above quoted. As to the effect of the provision for further formal contract, we said:

"The principal question suggested by the record is whether the writing containing the bid of Dunnavant and the acceptance thereof by the appellant constituted the completed contract between the parties, or was it an agreement settling some of the terms of a contract to be entered into later. The face of the writing, it is at once apparent, indicates that it was intended as the latter rather than the former. After specifying certain particulars, it expressly provides that a formal contract is to follow. If the writing itself was intended as the completed contract, there would have been no need for this proviso. A contract complete in itself does not need the sanction of another contract."

The statement in the letter of October 20th, that "our regular contract will be sent you in due course," patently indicates that the parties intended a subsequent agreement to be made, and that they did not intend the letter as a binding contract. The court found, in effect, and that finding is amply sustained by the evidence, that the parties intended a subsequent agreement to be made.

To constitute a contract, the minds of the parties must assent to the same thing in the same sense. There must be, as we held in *Loewi v. Long*, 76 Wash. 480, 136 Pac. 673, a mutual assent to all of the provisions; for, so long as any matter forming an element of the contract is left open, the contract is not complete. We said:

"To determine whether or not a contractual relation has been established by informal writings, such as letters and telegrams, where the parties have in mind the subsequent signing of a formal written contract, it is necessary to inquire, (a) whether the subject-matter has been agreed upon, (b) whether the terms are all stated in the informal writings, and (c) whether the parties intended a binding agreement prior to the time

of the signing and delivery of a formal contract. If the subject-matter is not in dispute, the terms are agreed upon, and the intention of the parties plain, then a contract exists between them by virtue of the informal writings, even though they may contemplate that a more formal contract shall be subsequently executed and delivered.''

While the appellant's president testified that he considered the contract embodied the same terms as the letter, he further claimed that the shipment was to be governed by the terms of the formal contract and bill of lading.

It clearly appears from a comparison of the letter with the terms of the formal contract and provisions of the bill of lading, that the latter included a number of new provisions which differ substantially from the terms of the letter. The trial court correctly found that the parties contemplated a further formal contract to be exchanged between them before becoming finally bound, and that no binding contract was ever entered into between them.

The judgment is affirmed.

BEALS, C. J., MITCHELL, MAIN, and STEINERT, JJ., concur.