[No. 4956–1. Division One. April 10, 1978.]

ALEXANDER & ALEXANDER, INC., *Appellant,* v.
LOUIS WOHLMAN, ET AL, *Respondents.*

*Karr, Tuttle, Koch, Campbell, Mawer & Morrow, Floyd L. Newland,* and *James R. Dickens,* for appellant.

*Ferguson & Burdell, Henry C. Jameson,* and *Henry W. Dean,* for respondents.

RINGOLD, J.—This matter concerns the validity of non-competition covenants entered into by employees of a local insurance brokerage firm, Maier & Sargent, Inc. (MS), upon the sale of its business to Alexander & Alexander, Inc. (A&A), a national insurance brokerage firm.

The trial court held the covenants unenforceable upon three grounds: (1) as to the defendant Wohlman, there was no mutual assent; (2) as to both defendants Harrison P. Sargent, Jr., and Wohlman, the covenants were not supported by consideration, and (3) the covenants were unreasonable and therefore invalid.

We reverse and remand for a trial upon the issue of damages. The defendants also argue that under the Washington Consumer Protection Act (WCPA), RCW 19.86.030, the covenants are illegal contracts in restraint of trade. The plaintiffs contend that the defendants breached a common–law fiduciary duty upon the termination of their employment with A&A. In view of our disposition of this case, we do not decide these issues.

## PROCEDURE

The plaintiffs sought injunctive relief and damages for violation of the noncompetition agreements, which were contained in documents signed by the defendants effectuating the sale in 1972 of the Seattle insurance brokerage business of MS to the plaintiff A&A. Preliminary injunctions were granted against both defendants and the case subsequently proceeded to trial in June 1976. After a bench trial of several days, the trial court dissolved the preliminary injunction and made findings of fact and conclusions of law and entered judgment dismissing the complaint in favor of the defendants. The basic assignments of error involve one paragraph of the findings of fact and all the conclusions of law.

## FACTS

We paraphrase the essential facts found by the trial court. The defendant, Louis Wohlman, has been employed in the insurance business since 1950. In January 1969, he was employed by Grosenick, Maier & Sargent, Inc., a corporation (GM&S), bringing with him a number of his clients. He was given 13 shares of nonvoting stock as a bonus for joining GM&S.

The defendant, Harrison P. Sargent, Jr., worked all of his adult life in the insurance business. In 1967 he joined GM&S, also bringing with him from his previous employment a number of accounts that he had produced. His father, Harrison P. Sargent, Sr., was one of the principal stockholders in GM&S. Harrison P. Sargent, Jr., was never issued any shares of that corporation.

In 1969, Grosenick left the firm and the corporate name was changed to Maier & Sargent, Inc.

At no material time did Wohlman or Harrison P. Sargent, Jr., serve as directors of either GM&S or MS, nor did they own any voting stock. Throughout the course of the employment with GM&S and MS, both defendants were salaried employees acting as insurance brokers without say in the management of the corporation. After the sale of MS to A&A they both continued as salaried employees of A&A.

A&A is a Maryland corporation with headquarters in New York City. It operates numerous insurance brokerage offices in the United States. At the time of trial Sargent, Jr. and Wohlman were insurance brokers, sole stockholders of Wohlman & Sargent, a corporation formed just prior to their resignation from A&A.

The voting stock of MS was divided equally between Harrison P. Sargent, Sr., and G. Sheldon Maier. Early in 1972, Maier and Sargent, Sr. entered into negotiations for the sale of MS to A&A, which was desirous of expanding into the Pacific Northwest.

All negotiations between A&A and MS were conducted by Messrs. Sargent, Sr. and Maier. While the defendants did not participate in any way in the negotiations, they were aware that discussions for the sale of MS were in progress.

By June 1972 agreement had been reached on the acquisition of MS by A&A. A&A agreed to transfer to MS 24,000 shares of its common capital stock. In return MS would transfer to A&A its assets which included as the primary asset the insurance business of MS. Thereafter MS would be dissolved. MS's annual income was $636,000 and its net tangible assets were $132,246.71. A frequent shorthand method to value the goodwill of an insurance brokerage business is to multiply 1 year's annual commission income by the "commission multiple." The commission multiple is generally 1.5 to 2.0. A&A thus was paying 1.8 times the annual commission income for the entire business.

The agreement and plan of reorganization was drafted so that the A&A stock given to MS could be received by its shareholders in a tax–free transaction. While negotiations were pending, Messrs. Maier and Harrison P. Sargent, Sr., decided they would distribute portions of the A&A stock to be received by the corporation to their employees, regardless of whether or not those employees held any stock in MS. They agreed between themselves on a formula for distributing the stock of A&A to the employees of MS upon the dissolution of the local firm. Neither of the defendants was consulted, nor did they participate in the decision as to the manner in which the stock was to be distributed to them or to the other employees.

It was determined that A&A stock would be distributed to the MS employees in proportion to the commission income which each generated in the preceding year. While Wohlman held only 2.89 percent of the stock of MS, he received 2,035 shares worth $79,365 at $39 per share, or over 8 percent of the A&A stock distributed to the employees and shareholders of MS. Harrison P. Sargent, Jr., received 710 shares worth $27,690 at $39 per share.

On June 12, 1972, all of the brokers employed by MS were taken to the conference room of the attorneys for MS. The purpose of the meeting was to execute the "Agreement and Plan of Reorganization." (Trial Exhibit 3.) During the meeting, blank signature pages were passed around and signed. The formal legal documents themselves had not been completed, nor were the provisions or contents of such documents explained to the employees of MS.

The signature pages had been signed by all of the employees except Harrison P. Sargent, Jr. At a subsequent time, the signature pages were attached to 32 pages comprising the final completed documents. Both defendants were aware that the agreements to be executed by MS contained a provision prohibiting all employees from engaging in the insurance business at all within 100 miles of Seattle for a period of 2 years after June 12, 1972, the date of closing. Wohlman had been further advised by Harrison P.

Sargent, Sr., that there was another restriction upon competition contained in the documents, but that it was probably not enforceable.

The covenants at issue provided as follows:

5.8 *Protection of Business.* Each stockholder, as to himself, agrees that except as an employee of A&A and/or its subsidiaries:

5.8.1. For a period of five (5) years after closing, he will not, directly or indirectly, engage in the insurance agency or insurance brokerage business within a radius of 100 miles from the location of the office of MS at the time of closing;

5.8.2. For a period of five (5) years, from and after the termination of his employment with A&A and/or its subsidiaries, he will not, either as a director, officer, employee, partner, consultant or other participant in any business, solicit, sell, serve, divert or receive insurance business to or from any customer of MS as of the Closing date;

5.8.3. For a period of five (5) years, from and after the termination of his employment with A&A and/or its subsidiaries, he will not, either as a director, officer, employee, partner, consultant or other participant in any business, solicit, sell, serve, divert or receive insurance agency, insurance brokerage, actuary or em‐ployee–benefit reporting business to or from any customer of A&A or any of its subsidiaries as of the date of such termination.

Paragraph 5.8.6 of exhibit 3 limits the provisions of the restrictive covenants quoted above to a period of 2 years as applied to Wohlman.

Wohlman had not reviewed the agreement prior to signing it, and he did not receive a copy of exhibit 3 until approximately 6 months after the date of closing.

At Harrison P. Sargent, Jr.'s request, the execution of the noncompetition covenants was delayed to November 1972. He executed a 2–page agreement (Trial Exhibit 8) containing the restrictive covenants with the same wording as contained in paragraphs 5.8, 5.8.1, 5.8.2, 5.8.3, exhibit 3, except "for a period of five (5) years . . ." read "for a period of (2) two years. . . ." The 710 shares of A&A stock would not

have been distributed to him had he not signed the non-competition covenants.

There was no contract of employment ever executed between A&A and the defendants. The shares were given to the defendants by MS as a bonus or inducement for them to work for A&A. They continued their employment with A&A at a salary until January 16, 1976. In the calendar year 1975 Wohlman had produced commission income for A&A of approximately $280,000 and Harrison P. Sargent, Jr., approximately $80,000.

Between Christmas 1975 and New Year's Day 1976, the defendants decided to leave the employment of A&A. On Friday afternoon, January 16, 1976, after Mr. Maier, the manager of the Seattle office, had left for the weekend, they submitted their letters of resignation and took with them personal possessions and certain schedule books for use as forms in the conduct of their business. Between January 12 and 16, 1976, each of the defendants personally contacted clients of theirs to inform them of their decision to leave A&A and the formation of the new firm, Wohlman & Sargent, Inc. On January 17 and 19 defendants sent letters to clients requesting broker–of–record letters.

At trial A&A conceded that the noncompetition covenants are unreasonable as to geographical scope and should relate only to the customers from A&A's Seattle office.

The trial court found:

### Finding of Fact
### XXXI

Had the defendants been the principals of the firm Maier & Sargent, the restrictions contained in Exhibits No. 3 and 8 might be reasonable. However, as applied to these defendants, the restrictions (including the two–year time period) contained in Exhibits No. 3 and 8 are unreasonable. Those restrictions preclude the defendants from soliciting customers who may no longer even give their business to Alexander & Alexander. The restrictions preclude the defendants from soliciting commercial accounts of individuals who give only their personal business to Alexander & Alexander. The restrictions bar

the defendants from soliciting insurance business from clients who give only their actuarial business only [sic] to Alexander & Alexander. The restrictions preclude the defendants from soliciting or accepting group insurance from customers who give only property and casualty insurance business to the defendant [sic]. Finally, the covenants as written prevent the defendants from soliciting or accepting business from clients whom they had produced on their own initiative prior to ever joining the plaintiff and who rely solely on the expertise and service of the defendants without regard to their affiliation with any company. Such restrictions are unreasonable and are not necessary for the protection of the business of the plaintiff.

The plaintiff assigned as error the entry of the foregoing finding and also the following:

### Conclusions of Law
#### II
There was no consideration to support Exhibit No. 8 and the restrictions contained in that agreement are unenforceable.
#### III
No contract was ever formed between the defendant Louis A. Wohlman and the plaintiff in that there was no mutual assent to the provisions of Exhibit No. 3 and in that there was no consideration from plaintiff to support Exhibit No. 3.
#### IV
The restrictions contained in Exhibit No. 3 and Exhibit No. 8 upon the business activities of the defendant are unreasonable and not necessary for the protection of the plaintiff. In view of this Court's conclusions regarding the validity of those contracts, it is not necessary for this Court to rewrite those agreements in order to make them reasonable.

### MUTUAL ASSENT
The trial court's conclusion that there was no "assent" by Wohlman rests solely upon the fact that Wohlman did not read the documents before he signed though he was generally aware of the fact that there were noncompetition covenants in the documents:

Q: Now, Mr. Wohlman, prior to the time, prior to June 12, had you become aware in any way that pursuant to this sale certain restrictions would be placed upon your employment by Alexander & Alexander?

A: Yes. In spite of the fact that I didn't read it, I knew that I was committed to Alexander & Alexander for two years, there is no doubt in my mind, and I had made up my mind that I was going to stay there two years.

Q: Two years from when?

A: I would assume from the date that the signature was on this document, that's what I have always assumed.

Q: Were you aware of any further restriction running for any period of time after you terminated employment with A&A?

A: As Mr. Maier testified, he discussed with me the two years. I don't recall he ever discussed with me any period of time beyond that period but I know that I did discuss with Harry Sargent. Now, remember, Harry Sargent not only is a very close friend of mine, but I have a great deal of respect for him, and he is an attorney, and I talked to him about, you know, what all is in this agreement that I am going to be signing. And he again told me about the two years and said that there is something that goes beyond two years, but his comment was it isn't worth the paper it's printed on. So I didn't worry about it.

Q: And you signed the document on June 12, 1972?

A: Yes.

. . .

Q: Now you just told me a few moments ago that you discussed the noncompete covenants with Mr. Sargent, Sr. before the documents were signed on June 12, 1972, is that right?

A: Yes.

Q: Where was the discussion?

A: I have no idea.

Q: Do you recall how long it was?

A: Well, it was probably a series of discussions, not just one single discussion.

Wohlman argues that before there can be assent to the terms of the offer, the offeree must be aware of the nature of the promise required by him and that the offer must be

communicated to the offeree if it is to form the basis of the contract. *Farrell v. Neilson,* 43 Wn.2d 647, 263 P.2d 264 (1953). A&A's offer was communicated to Wohlman and he knew the nature of the promise required of him, *viz.,* not to compete upon termination of employment. He elected not to know all the terms.

The Restatement of Contracts provides:

> Except as qualified by § 70, it is essential to the existence of an offer that there should be a proposal by the offeror to the offeree, and that the offeree should know that a proposal has been made to him. It is not essential that the manifestation shall accurately convey the thought in the offeror's mind.

Restatement of Contracts § 23 (1932).

> One who makes a written offer which is accepted, or who manifests acceptance of the terms of a writing which he should reasonably understand to be an offer or proposed contract is bound by the contract, though ignorant of the terms of the writing or of its proper interpretation.

Restatement of Contracts § 70 (1932).

Wohlman's signature on the documents clearly manifested acceptance of the terms of exhibit 3. The commentary under section 23 elaborates:

> [A]n offeree, knowing that the offer has been made to him, but not knowing all its terms, can accept whatever terms it contains. For example, where an offer is contained in a writing, the offeree may, without reading the writing, accept it and bind himself without knowing its terms.

Wohlman cannot be heard to say that he did not read the documents or know of their contents.

> It is a general rule that a party to a contract which he has voluntarily signed will not be heard to declare that he did not read it, or was ignorant of its contents. *Perry v. Continental Ins. Co.,* 178 Wash. 24, 33 P.2d 661 (1934). One cannot, in the absence of fraud, deceit or coercion be heard to repudiate his own signature voluntarily and knowingly fixed to an instrument whose contents he was in law bound to understand. . . . The whole panoply of contract law rests on the principle that one is

bound by the contract which he voluntarily and knowingly signs.

*National Bank v. Equity Investors,* 81 Wn.2d 886, 912–13, 506 P.2d 20 (1973).

Wohlman had the free choice of either signing the agreement or not signing it. He could have requested an opportunity to see the text of the covenants which were available. He could have refused to sign the agreement, taken his clients and gone into business for himself. Wohlman decided to sign the agreement, accept employment with A&A, and obtain A&A stock.

■ In assessing the mutual assent problem in contract cases, Washington has expressly adopted the objective manifestation theory. "The Washington court has long adhered to the objective manifestation theory in construing the words and acts of alleged contractual parties." *Plumbing Shop, Inc. v. Pitts,* 67 Wn.2d 514, 517, 408 P.2d 382 (1965). *See Janzen v. Phillips,* 73 Wn.2d 174, 437 P.2d 189 (1968); *Leonard v. Washington Employers, Inc.,* 77 Wn.2d 271, 461 P.2d 538 (1969).

Cases in this state discussing mutual assent are concerned with the ambiguity of contractual terms, *Peoples Mortgage v. Vista View Builders,* 6 Wn. App. 744, 496 P.2d 354 (1972); *Swanson v. Holmquist,* 13 Wn. App. 939, 539 P.2d 104 (1975); *Strange & Co. v. Puget Sound Mach. Depot,* 176 Wash. 90, 28 P.2d 111 (1934); *Plumbing Shop, Inc. v. Pitts, supra.* The questions of ambiguity and of offer and acceptance require interpretation of objective manifestations, whether a writing or conduct, and the entitlement of one party to rely on the other's manifestations. Where the terms are clear the party seeking enforcement should be entitled to rely upon words and acts objectively manifesting the other party's intentions which a reasonable person would conclude entitle him to rely. "We impute to a person an intention corresponding to the reasonable meaning of his words and acts. Unexpressed intentions are nugatory when the problem is to ascertain the legal relations, if any,

between two parties." (Citations omitted.) *Plumbing Shop, Inc. v. Pitts, supra* at 517.

The objective manifestations are subject to the reasonable person test.

> It follows that the test of the true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

1 S. Williston, *A Treatise on the Law of Contracts* § 94 (3d ed. 1957).

There is no evidence that A&A had been advised that Wohlman did not consent to the undertakings, covenants and conditions assumed by the shareholders and employees of MS in the transfer of the business to A&A. A reasonable person in A&A's position had the right to conclude assent by Wohlman.

Wohlman had the right to read all documents. He relied upon Maier and Sargent, Sr. Whatever Wohlman's subjective intentions may have been, insofar as A&A was concerned, Wohlman, a knowledgeable insurance broker, had assented to and agreed to the terms encompassed within the document. There is no claim that Wohlman in good faith put a construction on the terms of the agreement which might make it ambiguous, but rather he did not know about them. The fact that Wohlman did not know the terms of the noncompetition covenants is a fact which should not be given very much weight when balanced against the entitlement of A&A to rely upon Wohlman's objective manifestations of assent. The doctrine of mutual assent must not be extended to permit one party to disavow a contract by asserting that he did not read one of its terms. Sargent, Jr., does not contend that he failed to read the documents containing the covenant to compete, and does not claim lack of assent to the agreement. The trial court erred in concluding that there was no mutual assent to the noncompetition covenants.

## CONSIDERATION

The parties were negotiating for the total sale of the business based upon all covenants, conditions and promises contained in exhibits 3 and 8 in return for its stock.

Consideration is defined in section 75 of Restatement of Contracts (1932) as "an act . . . bargained for and given in exchange for the promise." The trial court had found that the stock was given in exchange for and as an inducement to the defendants to enter the employ of A&A. The price which A&A was willing to pay for the business of MS bore a direct relationship to the amount of the gross commissions earned. The amount of insurance commissions produced by Sargent, Jr. and Wohlman prior to 1972 was a basis upon which the price A&A paid for MS was computed, as well as a basis for determining the amount of A&A stock they received. Their subsequent generation of insurance brokerage income was a significant standard by which their salaries were determined.

■ An act or a promise may be consideration for more than one promise. Restatement of Contracts § 83 (1932). The court interlineated the findings of fact: "That the 710 shares of A&A stock would not have been distributed to him [Sargent, Jr.] had he not then signed Exhibit No. 8." The same reasoning applies to the distribution of stock to Wohlman.

The defendants argue that the plaintiffs had not delivered A&A stock to the defendants in exchange for their bargained for execution of the noncompetition covenants. Wohlman and Sargent, Jr. also contend that negotiations with A&A were conducted exclusively by Maier and Harrison P. Sargent, Sr., and that A&A paid nothing to the defendants. Distribution of stock to the defendants was made not only as an inducement to enter the employ of A&A, but in exchange for the promises contained in the noncompetition covenants. The stock was paid to Wohlman and Sargent, Jr. going through MS. The mere fact that A&A dealt with others does not negate the presence of

consideration. Consideration need not go directly to the promisor.

(2) Consideration may be given to the promisor or to some other person. It may be given by the promisee or by some other person.

Comment *e* on section 75 states:

It matters not from whom the consideration moves or to whom it goes. If it is bargained for as the exchange for the promise, the promise is not gratuitous.

Restatement of Contracts § 75 (1932).

Prior to signing the exhibits 3 and 8, Wohlman and Harrison P. Sargent, Jr., knew that they would not receive the A&A stock unless they signed the noncompetition covenants. It is not necessary to engage in the face–to–face haggling of a flea market to meet the test of a "bargained for" promise.

In *John Davis & Co. v. Cedar Glen, # Four, Inc.,* 75 Wn.2d 214, 222, 450 P.2d 166 (1969) the court held:

It is not essential that the consideration move directly from the promisee. It is sufficient if it moves from a third person. Generally, if consideration is sufficient in other respects, it does not matter from whom the consideration moves. It may move from a third person as well as from the promisee.

(Citation omitted.)

The Washington courts have long defined consideration as any benefit to the promisor or detriment to the promisee. *See Harris v. Johnson,* 75 Wash. 291, 294–95, 134 P. 1048 (1913), where the court stated: "It is fundamental that any act which benefits the promisor, or results to the loss or prejudice of the promisee, is a sufficient consideration to support a promise to pay money." Here it is clear that there was a significant benefit to the promissors, *i.e.,* the receipt of more shares of A&A stock than they would have received in a proportionate distribution.

In *Franklin v. Fischer,* 34 Wn.2d 342, 208 P.2d 902 (1949) the assignees of the lessees paid to the lessees $3,000

for the assignment and for an oral modification by the lessor deleting a minimum rental payment required by the lease. The court held:

> The consideration for the oral modification was the detriment to the respondents [lessees] in paying three thousand dollars and taking over the property. . . . It is well established that a consideration may consist as well in a detriment to the person to whom a promise is made as in a benefit to the other party.

*Franklin v. Fischer, supra* at 346.

Similarly, the delivery of A&A stock to MS constituted a detriment to them sufficient to provide consideration for the promises not to compete.

In the view of A&A, the agreements not to compete were essential elements in the sale. If any employee left the employ of A&A and started to solicit past customers, he would effectively be taking back something which MS had sold to A&A as a part of the transaction. The trial court erred in concluding that there was no consideration to support the noncompetition covenants.

### REASONABLENESS OF THE NONCOMPETE COVENANTS

The trial court, in finding of fact No. 31 states:

> Had the defendant been the principal of the firm of Maier & Sargent, the restrictions contained in Exhibits No. 3 and 8 might be reasonable. However, as applied to these defendants, the restrictions, including the two–year time period contained in Exhibits No. 3 and No. 8 are unreasonable.

█ The "reasonableness" of the covenant is a conclusion of law, and we need not accept this finding as a verity. *Artz v. O'Bannon,* 17 Wn. App. 421, 562 P.2d 674 (1977); *State v. Reader's Digest Ass'n, Inc.,* 81 Wn.2d 259, 501 P.2d 290, *appeal dismissed,* 411 U.S. 945, 36 L. Ed. 2d 406, 93 S. Ct. 1927 (1972). The trial court is holding that the covenant might be reasonable as applied to Messrs. Maier and Sargent, Sr. as part of the sale of the business, but is unreasonable when applied to employees.

The defendants argue that in applying the test of reasonableness, courts often distinguish restrictive covenants arising from the sale of the business from those appearing in employment contracts. A restriction which might be reasonable as applied to the seller of a business may be found unreasonable as applied to a former employee. This principle is enunciated in Restatement of Contracts § 515, comment *b* (1932) as follows:

> No identical test of reasonableness applies to bargains for the transfer of land or goods or of a business, on the one hand, and to bargains for employment on the other. The elements that must be considered in order to determine reasonableness differ in the two cases, especially where the employment is of a specialized character, and familiarity and skill in it are assets of the employee. Limitations of his use of these assets are less readily supported than limitations of the use of property or in carrying on a business.

In the present context we hold that Wohlman and Sargent, Jr. were employees. The leading case in this state regarding enforceability of covenant not to compete against a former employer is *Wood v. May,* 73 Wn.2d 307, 438 P.2d 587 (1968). Wood employed May as an apprentice horseshoer. The parties signed a contract wherein Wood agreed to teach May the art of horseshoeing. May agreed:

> [F]or a period of five years from and after the time he shall leave . . . he shall not engage directly or indirectly in any business or enterprise the nature of which is competitive to the employers business, . . . within a radius of one hundred (100) miles from the Oakwood Horseshoeing . . .

*Wood v. May, supra* at 308.

After working with Wood for 2 years, May was the only contact the customers had with the business. A year later May set up his own horseshoeing establishment 5 miles from Wood's place of business. The action was commenced to enjoin May from engaging in horseshoeing in violation of the agreement.

The trial court dismissed the cause at the close of the plaintiff's case, finding that although the contract was reasonable it was unreasonable to restrict May from horse-shoeing within a radius of 100 miles of Spanaway.

Relying upon *Racine v. Bender,* 141 Wash. 606, 252 P. 115 (1927) the Supreme Court recognized the following principles in relation to restrictive covenants in employment contracts.

> The general rule applied in construing such contracts, is that restrictions therein are upheld, if they meet the test of showing that they are not greater than are reasonably necessary to protect the business or good will of the employer, even though they restrain the employee of his liberty to engage in a certain occupation or business, and deprive the public of the services, or restrain trade.

(Citation omitted.) *Racine v. Bender, supra* at 611.

The *Wood* court restated the three–part test from 9 A.L.R. 1467, 1468, adopted in *Racine* for determining the reasonableness of a covenant not to compete. The factors are: (1) whether restraint is necessary for the protection of the business or goodwill of the employer, (2) whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the business of the employer or the goodwill thereof, and (3) whether the degree of injury to the public is such loss of the service and skill of the employee to warrant nonenforcement of the covenant.

The *Wood* court held that the covenants were unreasonable not only as to area, but also as to time. Nevertheless, the court reversed the trial court's dismissal of the action, and adopted the rule that a covenant not to compete will be enforced to the extent that it is reasonable and lawful. *Wood v. May, supra* at 312. The trial court here found the covenants unreasonable and therefore wholly unenforceable. We hold that the proper approach is to apply the test and then to enforce the covenants so far as reasonable.

In applying the test, we determine that the covenant was unreasonable in its geographic scope. It was not necessary for the protection of A&A's business to restrict Wohlman

and Sargent, Jr. from competing anywhere except in the general Seattle area. In considering hardships on the employee, the employee is not precluded from engaging in his profession, but is limited in his pursuit of customers whom he may be permitted to solicit and serve.

In considering the injury to the public test, in this instance members of the public should be entitled to select whatever insurance broker they desire. The relationship between broker and insured is often highly personal. The evidence in this case does indicate that there were customers who would have preferred to be served by the defendant insurance brokerage firm rather than by the plaintiff, even without any solicitation upon the part of the defendants.

The *Wood* court cites with approval S. Williston, *Contracts* § 1660 (rev. ed. 1937):

> If a sharply defined line separated a restraint which is excessive territorially from such restraint as is permissible, there seems no reason why effect should not be given to a restrictive promise indivisible in terms, to the extent that it is lawful. If it be said that the attempt to impose an excessive restraint invalidates the whole promise, a similar attempt should invalidate a whole contract, though the promises are in terms divisible. Questions involving legality of contracts should not depend on form. Public policy surely is not concerned to distinguish differences of wording in agreements of identical meaning.

(Citation omitted.)

The court then continues:

> We are in accord with the views expressed by Corbin and Williston. Under the circumstances of this case we find it just and equitable to protect appellant [Wood] by injunction to the extent necessary to accomplish the basic purpose of the contract insofar as such contract is reasonable.

*Wood v. May, supra* at 314.

The trial court erred in concluding that the covenants were totally unenforceable. We conclude the agreements not to compete meet the three–part test of reasonableness

when (a) applicable only to the greater Seattle area, and (b) are proscriptive only of the solicitation and diversion of any insurance agency, insurance brokerage, actuary or employee–benefit reporting business of any customer of the Seattle office of A&A to Wohlman and Sargent, Jr. for 2 years after date of termination.

## REMEDY

The defendants contend that since the covenants would expire by their terms 2 years after January 16, 1976, the issue is moot and no injunctive relief can be granted.

■ The plaintiffs sought both equitable relief and damages. It was within the discretion of the trial court—had the trial court found that the noncompetition agreements were valid—to have either granted injunctive relief in equity or concluded that rather than injunctive relief the plaintiff would be relegated to its action for damages. The rule was expressly adopted in *Twohy v. Slate Creek Mining Co.*, 36 Wn.2d 801, 803, 220 P.2d 1075 (1950):

"If one sues in equity in good faith and fails to establish his cause, but shows a state of facts entitling him to recover at law, the court, having rightfully obtained jurisdiction for a proper purpose, may retain the cause and grant just such relief as, on the facts, the complainant appears to be entitled to, whether at law or in equity.

(Citation omitted.) *See* 27 Am. Jur. 2d *Equity* §§ 112, 113, 114 (1966).

Injunctive relief at this stage would be inappropriate and manifestly unfair to Wohlman and Sargent, Jr. This matter is remanded for a trial upon the issue of damages only.

The plaintiff is entitled to recover for the loss of brokerage commissions resulting from defendants' solicitation and diversion of any insurance agency, insurance brokerage, actuary or employee–benefit reporting business of any customer of plaintiff's Seattle office to the defendants or to Wohlman & Sargent, Inc., during the 2–year period after termination. The judgment is reversed and the cause

remanded for trial in accordance with this opinion.

CALLOW, J., concurs.
FARRIS, C.J., concurs in the result.

Reconsideration denied June 12, 1978.

Review denied by Supreme Court December 1, 1978.